JOHN ATKINSON v. THE DETROIT FREE PRESS COMPANY.

*Newspaper libel upon a lawyer—Justification—Res gestæ—Hearsay.*

It is libelous to publish of a lawyer an article charging him with giving dishonest and unprofessional advice, with making false statements in professional dealings, with incurring loss of confidence by misconduct, with embezzling moneys and with making false charges for services and extorting excessive compensation.

A lawyer brought an action for libel based on a newspaper article which charged him with having appropriated more than a fair share of the moneys which a client had caused to be placed in his charge just after departing for a foreign jurisdiction where his creditors could less easily trouble him. Under a plea of justification evidence was admitted of the statements of a couple of creditors who had pursued their debtor and who professed that he had intimated some suspicion as to the safety of his funds. There was no evidence that plaintiff had done anything to have the money sent back to him, but the evidence was admitted as *res gestæ* and on the ground that the lawyer and client and the go-between who carried the money were "all together in the transaction." *Held,* error; such declarations could not be treated as *res gestæ;* nor could the conduct of creditors among themselves out of the plaintiff's presence and not communicated to or acted on by him.

Error to the Superior Court of Detroit. Submitted January 25. Decided June 29.

CASE for libel. Plaintiff brings error. Reversed.

*James T. Keena, John G. Hawley, Theodore Romeyn* and *Henry M. Cheever* for plaintiff in error.

*F. A. Baker, E. F. Conely* and *G. V. N. Lothrop* for defendant in error. The acts and declarations of others who were concerned with the plaintiff are admissible under a plea of justification in an action for libel where necessary to a full exposition of the matter, and they may be admissible against one another: 1 Phil. Ev. C. H. & E. notes 205 n. 83 : *People v. Jenness* 5 Mich. 323.

CAMPBELL, J.   Atkinson sued for a libel, which contained reflections upon his conduct in relation to certain dealings and transactions connected with Gardner K. Clark. Mr.

Clark's action, with which Atkinson was claimed to have been involved, was in brief as follows:

Clark was a dealer in grain and grain contracts in Detroit, and bought and sold in considerable amounts. On April 5, 1878, Clark had in various dealings issued checks to the amount, as outstanding at the close of the business day, of $11,096.39. At the same time on that day he had on deposit at the Mechanic's Bank, $9867.51, and a check of Gillett & Hall, of Detroit, for $1014; leaving a deficiency or loss on the day's balances of $214.88. That evening he called on Col. Atkinson for professional advice. His statement is that he had reason to fear that his bank account would be garnisheed by parties in Chicago, and his business facilities be crippled so that he could not pay his checks; and that he asked Atkinson whether he would incur any criminal liability by drawing his money, so as to make a uniform settlement. He says that being informed he would not, he then told Col. Atkinson he proposed to go to Toronto for a few days until it was settled, and that Atkinson did not advise him to go.

The next morning Clark went with Atkinson and drew out his money from the bank, a messenger with a check for the balance not designated having been previously refused payment on such a general voucher. They then went to Atkinson's office, each carrying a part of the packages of notes, and at that place the Gillett & Hall check, which Mr. Clark had handed to Mr. H. E. McNeil to present at the 2nd National Bank on which it was drawn, was brought back with the statement that the bank would only pay it in the regular course of bank exchanges. This check was handed to Col. Atkinson for collection, and he was given a list of Clark's outstanding checks, and Clark desired him, if he could, to settle at one-fourth cash and the remainder on time.

Clark went over to Windsor, and missing the early train on which his wife had started, remained in the immediate vicinity at Walkertown until the noon train, on which he left for Toronto, but stopped at Hamilton that Saturday night.

While in Windsor or Walkertown he entrusted the bulk of the money to McNeil, who during the day came back to Detroit, and delivered the principal part of it to Atkinson, who left it for safe-keeping in the People's Savings Bank, and on Monday took certificates of deposite for all but $1000, which sum he deposited in the Detroit Savings Bank. The amount of money received from McNeil is shown to have been about $8750. A portion of the balance is not fully explained.

Atkinson met the creditors three times during the day, and telegraphed to Clark without getting any reply until in the afternoon. He went to Windsor to find him, but failed to do so. At these meetings various conversations concerning settlement occurred, on which there is some conflict, but which are not important except in connection with the justification of the libel, to which reference will be made hereafter. At the last meeting he offered the terms given him by Clark in the morning, but they were rejected. The communications concerning the settlement are among the matters involved in some controversy, both as to time and circumstances.

Atkinson left the Gillett & Hall note at the People's Savings Bank, and took therefor a certificate of deposit. Gillett & Hall stopped its payment, and Atkinson took it back and informed Gillett & Hall it would not be used to their prejudice. Upon the terms of this communication some questions also were made at the trial, as raised by the libel.

Two of Clark's creditors, Messrs. Lasier and McDonald, visited him at Hamilton and induced him to return to Detroit, agreeing to see that he was not molested there. They reached Detroit early Monday morning, first calling on McNeil and then going to Col. Atkinson's house, where they remained a while and appointed a meeting at Clark's house at a little later hour, with the expectation of coming to an arrangement. At the agreed time it was found by Lasier and McDonald that the other creditors stood out, and were disposed to prosecute, and accordingly they took

Clark back to Windsor. In the meantime some creditors had sent to Clark's brother in Boston, and on Tuesday morning he arrived. Atkinson made a settlement and turned over the money and securities. This settlement is also involved in the libel. Clark, through his brother, settled for 75 cents cash, and got time for the balance.

On Tuesday, the 16th of April, one week after the settlement, the libel complained of was published. The managing editor before publishing it had interviews with various creditors and other parties concerning its correctness. Some opposed and some did not oppose its publication. It was not published at their instance. After its publication a communication was published signed by Mr. Clark, and approved—so far as his knowledge went—by Col. Atkinson. In publishing it the editors of the *Free Press* commented on it at some length, referring to facts outside of it, and in conclusion said: "It is difficult to see wherein the *Free Press* statement of Tuesday needs to be corrected in the interest of that truth which Atkinson wishes to spread before the public."

This last publication was introduced to show malice in repeating and adhering to the charges before made, and is not made the ground of action by itself.

The publication sued on consisted of a continuous narrative, with a conspicuous heading, purporting to give a full account of the entire dealings of the parties said to have been involved in Clark's affairs. The whole libel is set out as a single grievance, the account being so drawn up as to prevent any convenient separation of Atkinson's part from the rest. But the grounds on which the principal grievances appear to be based are chiefly these :—The heading was in these words : " *An inside view—Some hitherto unpublished facts respecting the Clark affair—The figure which several parties cut therein—The movements of Clark and the action of his attorneys—Clark's 'misfortunes' the biggest kind of grist for his lawyer—Rather slight services for a very large fee—$125 gathered in for 'previous ser-*

*vices'—A plain, unvarnished tale from which each reader can draw his moral.*

These references to professional misconduct, which are undoubtedly libellous on their face, appear from the body of the publication, and are also averred by the innuendoes to relate to Col. Atkinson. It is claimed, and I think justly, that they indicate that Atkinson took advantage of Clark's circumstances to make extortionate charges for services and pretended services.

In the body of the principal article, the chief indications of an offensive character, as apparent from the words alone or as applied by the innuendoes, seem to include a series of acts, which are declared to "reflect no credit on the parties of the second part, who have figured more or less prominently in the affair." Atkinson and McNeil are the only persons mentioned, and it is averred the reference was made to plaintiff, who is also connected by averment with a previous reference to a " 'power' behind the throne,' which moved in a mysterious way." Proceeding with the narrative, reference is made to Clark's claim that he heard Chicago parties meant to garnishee his deposits, and it was stated that on Friday evening or Saturday morning, at McNeil's suggestion, Clark called on Atkinson. Then follows this sentence, which is by averment alleged to mean that Atkinson gave advice which was improper, dishonest, and discreditable to him professionally : "The advice that was given to Clark by Atkinson is of course not positively known to any beside those two, but the subsequent visit of Clark and Atkinson on Saturday morning to the bank, and their drawing out the money, to be followed almost immediately by Clark's departure for Windsor, caused certain inferences to be drawn, too obvious to mention."

The article then stated that, " On withdrawing his money, $9867, from the bank, Clark passed part of it to Atkinson, which, on arriving at the head of the stairs, leading to Atkinson's office, was, Atkinson stated, passed back to Clark." This last phrase, " Atkinson stated," is averred to mean that Atkinson retained a part of the money, and at

the close of the article is a further statement, with similar averment of its reference to Atkinson, that "some one has in the neighborhood of $500, which is, as yet, not present or accounted for."

In the narrative of the proceedings of Atkinson and the creditors on Saturday reference is made to the concealment from Atkinson by the creditors of their knowledge of Clark's movements in Canada, as reported to them by Captain Rogers, the chief of police, who happened to be in his company, and also to certain matters connected with the Gillett & Hall check, concerning which it was intimated that Atkinson made false suggestions as to his own course in saving Gillett & Hall from responsibility. There are also further descriptions of Atkinson's statements concerning the amount and whereabouts of the money drawn, and a reference to information derived from Clark by Lasier and McDonald, as to his communications with Atkinson and his transmission of the money to Atkinson, with further intimations, as drawn from the language directly, or implied by averment, that Atkinson made false statements to the creditors concerning this money, and concerning his authority.

There is then a passage stating that Clark when found by Lasier and McDonald "showed his lack of confidence in his home representatives by offering to telegraph and have a detective shadow the man who had his creditors' money, until they could get back to Detroit." This is averred to refer to Atkinson, as also a further statement that Clark "finally consented to return to Detroit, and endeavor to regain possession of his, or rather, his creditors' money."

In describing the subsequent occurrences in Detroit when Lasier & McDonald visited Atkinson, it is said that Clark informed them, that McNeil said he had given the whole money to Atkinson, but that Atkinson claimed it was $500 short, and this is averred to mean that Atkinson claimed he received so much less than he really did.

It is subsequently stated that Clark's brother was informed when he reached Detroit by three persons named T. P. Hall, Alexander Lewis and John G. Erwin, that the credit-

ors were unwilling to trust Atkinson, and they thought a speedy settlement could be made if Clark could be got out from his influence. This is connected with an allegation that it meant to indicate that Atkinson was unworthy of credit in his profession. This was followed by a reference to the final settlement, when Atkinson is averred to have rendered an account of which it is said "a copy of its most important items is appended." This reference gives special attention to an item italicised as for "*previous*" services, which is alleged to mean that the charge was false and discreditable. It then is followed by a series of calculations including similar intimations as to charges for services, and ending with the remark previously mentioned that "some one has in the neighborhood of $500, which is, as yet, not present or accounted for." This is alleged as "meaning that plaintiff, in his employment as aforesaid, has dishonestly failed to account to his client for $500 entrusted to him." There are two counts in the declaration, but for present purposes I need not refer to them at large. The defendant put in the general issue, with a general justification.

The effect of the various statements claimed to be libellous was to charge Atkinson with giving dishonest and unprofessional advice, with making false statements in professional dealings, with incurring loss of confidence by misconduct, with embezzling moneys, and with making false charges for services, and extorting excessive compensation. All of these are in the declaration alleged as appearing in the libel, and intended to be conveyed by it.

When no defence is put in except the general issue, the language of a libel may be shown to fairly bear a mitigated sense. But when a libel is justified generally the doctrine is well settled that so far as the justification is concerned, it is justified as applied or explained by the innuendoes, and therefore there is no justification made out by the evidence unless the facts are proven true as alleged in the declaration, and with the meaning there averred, unless with the aid of the colloquium such meaning is repugnant. Townshend on Libel

and Slander §§ 212, 214, 215, 357, and notes; *Bissell v. Cornell* 24 Wend. 354; *Fidler v. Delavan* 20 Wend. 57; *Tillotson v. Cheetham* 3 Johns. 56; *Gage v. Robinson* 12 Ohio 250; *Helsham v. Blackwood* 5 E. L. & Eq. 409; *Lewis v. Clement* 3 B. & Ald. 702: 3 Br. & B. 297; *Lake v. King* 1 Wms. Saund. 130 and notes; 1 Chit. Pl. 433; *Weiss v. Whittemore* 28 Mich. 366; *Cresinger v. Reed* 25 Mich. 450; *Bailey v. Kalamazoo Pub. Co.* 40 Mich. 251. Unless every material item of defamation is established the plaintiff must recover his damages for so much as is not fully justified. The truth of one part cannot deprive him of his action for that which is not shown to be true.

It has not been suggested in this case that any of the averments of the defamatory meaning of parts of the libellous article are repugnant or not maintained by the article itself as read in the light of the other averments. As to such statements as refer to hearsay, or are claimed to be capable of a double sense, the averment of their offensive meaning makes them libellous if justified. Giving defamatory statements as coming from other persons does not deprive them of their defamatory character. *Burt v. McBain* 29 Mich. 260.

A considerable number of the errors assigned are supposed to depend on these principles. Others relate to the reception or rejection of testimony. While the record is long, the questions presented may be to some extent dealt with so as to avoid the necessity of great repetition. So far as the objections refer to the admission of testimony, they are chiefly based on the ground, which is undoubtedly correct as far as it may be applicable, that nothing was properly at issue that had not some tendency to show the charges against Atkinson himself, well or ill founded in fact, or else credibly represented to be so, and published in that belief. How far the matters affecting him personally can be separated from the rest is therefore one of the questions of some difficulty in the case.

The record is free from some complications that have caused difficulty in other causes. While the good faith and

probable cause of belief of the managers of the defendant. corporation appear to be involved here as they are in most similar cases, there is no controversy concerning the deliberate and intentional character of the publication, and therefore no dispute as to the persons responsible.   The repetition in the supplementary article, and the knowledge and approval by the managing editor, remove any such question from the issues.   Neither is the article connected with any matter concerning which it could be regarded as privileged. It does not relate to facts which could be lawfully published except as true.

The first class of objections to evidence included some extended narrations of Clark's dealings on the fifth day of April.   There is nothing in the libel either in direct language or as made out by averments or innuendoes, which charges Atkinson with any complicity in these dealings.   A general notice of justification must undoubtedly be construed as covering all the ground which could be covered by special pleas.   But no plea would be proper which attempted to prove by way of justification facts not charged against the plaintiff.   If Clark had been plaintiff, the testimony of his dealings on the 5th would be very material.   The admission of this could only be pertinent to create a belief that there was some dishonesty which bore upon the plaintiff.   It could hardly fail to prejudice him by coloring the whole case with matter to which he was a stranger.   The libel begins his connection with Clark after the close of business on the 5th, or in the morning of the next day.   It was not disputed that it might be shown what was the condition of his bank credits and checks out at that time, and who held them.   But the details of his business dealings which led to that condition of things could have no legitimate bearing on anything alleged against Col. Atkinson, and the justification cannot go beyond the charges.

A second class of testimony objected to is the statements and conversations of Clark with and to various other persons, while in Canada, including McNeil, McDonald and Lasier. The court allowed all of the conversations to be shown.

.And the reason given is found in what was said by the judge when McNeil was sworn, although similar rulings had been made before during the examination of McDonald and Lasier. When McNeil was inquired of concerning the transaction between him and Clark, the court used this language : " The claim in the article is, as I understand it, that McNeil and Atkinson and Clark were all together in this matter, and I think myself that what any one of them did, or any two of them did, would bind Col. Atkinson. It was a part of the *res gesta* as I look at it. And it is a part of the article, I believe; it has been so stated." Here the counsel for defendant was proceeding to show the court was mistaken as to the tenor of the article, when he was interrupted by the court, who proceeded as follows : " As far as there is anything in the case at all—and of course it is a question for the jury—the testimony shows that McNeil and Atkinson and Clark met together, and that McNeil and Atkinson and Clark were together in the matter, and the article, perhaps, substantially charges they were all together in the transactions; and I think you have a right to show [what] the conversations and transactions of the parties were at the time, to show what the real transaction was." On further objection that it was not shown in any way that Atkinson had any knowledge of the conversations, the court nevertheless ruled that all the testimony might be let in.

In a part of this ruling the court seems to have held, and the admission of testimony from McDonald and Lasier evidently could only be explained on this theory, that the fact that the article charged complicity between all three of these parties made the statements of any of them admissible. If all three had joined in this libel suit, there might be some difficulty in drawing lines very closely. But this suit is brought by Atkinson for libellous allegations against himself alone, and hearsay evidence is no more admissible against him in this than in any other case. If charged as a conspirator, the charge cannot be assumed as true until proven, and it certainly is not competent to prove a conspiracy by the declarations of a portion of the persons alleged to have

conspired. The conspiracy and its extent must be definitely and positively proved by legal evidence, before court and jury can give heed to any act or statement of persons not parties to the suit as to particular acts done under it. In this class of cases it is not permissible—on any theory of the order of proof—to allow hearsay that has not already been shown to be within some rule of agency. If, when the evidence is offered, there is not already in the case enough to show the agency, the admissions and statements of the supposed agent must be kept out. Agency or conspiracy is the first thing to be shown. The evidence was not admitted on the ground that the order of proof was discretionary, but on broader and absolute grounds. The question therefore arises in a double aspect: *First,* whether there was any charge in the libel which was justified on any such basis; and *second,* whether any such conspiracy had been shown by legal evidence, on which it would have been competent for the jury to have found it. The principal if not the only questions raised here do not relate to the transactions while Clark was in Detroit, but to the transmission and reception of the money from Canada and dealings subsequent thereto, or to Clark's departure from Detroit on April 6th. It is very plain that evidence of an agreement or combination, even for an unlawful purpose, has no tendency to prove such agreement for other purposes, and that where a conspiracy for wrong purposes is clearly proved, there is no responsibility for mutual conduct between the scope of that agreement. This is sufficiently explained in *People v. Knapp* 26 Mich. 112.

Our attention has not been called to anything which indicates a charge in the libel that Atkinson was in any way implicated in any arrangement for the return of the money from Canada, or to any suggestion that when Clark left Detroit any such return was thought of. Nor is it pointed out in the argument in what way that return was calculated or intended to injure any one. The possession of the money by Atkinson prior to the last meeting of creditors on the 6th, and the purpose for which he held it, did become

material in view of other allegations concerning his statements and course at that meeting. But it does not appear that he was accused of any conspiracy to get it back into his hands, or that it was returned in furtherance of any such conspiracy. In regarding the proof, therefore, we must not confound the testimony as to the fact of its return with that which is hearsay.

So far as McNeil's testimony is concerned, it contains no statements of any consequence by Clark as to any act or declaration of Atkinson, and except for the ruling of the court that all were bound by each other's acts, it would not be very important. So far as it explains the purpose and conditions on which the money was put in McNeil's hands, it had no tendency to prejudice Atkinson, and being uncontradicted has a strong bearing in his favor, as it shows no authority whatever for giving him the money, and indicates that it was only given him as a safe custodian.

But in regard to McDonald and Lasier the case is different. Both were allowed to give their impressions, although neither was positive on the subject, that Clark said he directed the money to be put into the hands of Atkinson. This, taken in connection with his other statements in regard to his fears about the money, and distrust of its safety, must necessarily, in view of the ruling concerning joint liability, have operated to Atkinson's prejudice. Aside from these statements, there is nothing in the record tending to show that Clark was in any way concerned with Atkinson's obtaining possession of the money. And leaving out these statements, the testimony introduced by the defendant and not explained by any opposing proofs, tends to show that Atkinson did not receive the money for Clark himself or subject to his disposal, but as the property of Mrs. Clark, to whom he gave vouchers for it.

Some of these statements and suspicions, if they referred to Atkinson at all, upon which it will be necessary to dwell a moment hereafter, were made for a hostile purpose and in concert of action with the creditors. Upon what theory such declarations could be regarded as *res gestæ* in a con-

spiracy with Atkinson it is impossible to imagine. It is quite evident that the court below deemed it desirable to have all the transactions of Clark explained, as connected with the libel, on the same basis as if Clark himself were plaintiff. But I do. not think this identity of interest is within any proper theory of the case.

In this connection it is proper to refer to testimony not merely in reference to the statements in the libel as to Clark's lack of confidence in his agents, but also as to the opinions of the creditors. No doctrine is better settled than that a person has no more right to put in circulation the opinions or statements of other persons concerning private character than he has to publish his own. When such publication is made it cannot be justified by the proof that such views were expressed or entertained. Every justification must stand on facts and not on opinions or hearsay. Any inferences warranted by evidence may be drawn by the jury, and of course may be pressed on their attention, but no man's character can lawfully be assailed, and the object of every plea of justification is to directly assail it, by proof that other men do not have confidence in him, or speak evil of him. *Burt v. McBain* 29 Mich. 260; *Fowler v. Gilbert* 38 Mich. 292; *Watkin v. Hall* L. R. 3 Q. B. 396; *M'Pherson v. Daniels* 10 B. & C. 263; Townshend on Libel and Slander § 211.

For similar reasons evidence of the conduct of the creditors among themselves, and not in Atkinson's presence, and not communicated to or acted on by him, can in no proper sense be treated as part of the *res gestæ* to his prejudice. It is only his dealings that are in issue in this cause, and except as he is shown to have been in connection with others, their acts and sayings are outside of the controversy.

I think, subject to such exceptions as would exclude hearsay evidence, and matters otherwise irrelevant, that it was not improper to allow testimony of the whole course of negotiation and correspondence which resulted in a settlement. It was substantially one train of transactions begun by Atkinson and completed by Charles F. Clark, and Atkin-

son was more or less connected with the business until he turned over the funds and rendered his accounts. The terms of the settlement itself and whether it was complied with by Clark were not relevant.

I also think it was proper to allow Mr. Quinby and the others connected with the publication to show the circumstances which induced them to publish it. These matters bore upon the motives of the publishers, and, while no complete justification, would be properly open to consideration on the question of damages, if not justified by other proofs.

I see no good reason for rejecting proof of the value of Atkinson's legal services. Overcharging under peculiar circumstances was one of the most offensive suggestions of the libel. And a portion of the testimony excluded seems to have been relevant to the fact of garnishee proceedings as having once been had against Clark.

The charge of the court throughout disregarded the rule that a justification cannot be made out without proof that the plaintiff was guilty of the acts charged against him in the sense averred in the declaration. As this error pervades the entire charge, it is not necessary to refer specifically to the various instances in which particular portions were referred to specially and either declared not libellous or left to the jury to interpret.

The case was left to the jury with such instructions as would have authorized them to find, as they did find, a complete justification. This could only have been done by allowing weight to facts not proven by any legal evidence, and probably in accordance with the theories before referred to. But a plea of justification is an affirmative charge, to be made out by proof as strictly as if the defendant were a plaintiff seeking to enforce a liability. The libel itself is no proof, and no help to proof. Upon some very important charges there was no proof whatever, and upon some the defendant's testimony exculpated the plaintiff directly. There was no proof tending to show that Atkinson had any money not accounted for. There was none that he and Clark had any difference in regard to the funds, or that he

had done anything with them not authorized. Upon other points the testimony was more or less subject to the infirmities before referred to. The result of the trial and the size of the record indicate that whatever may be the facts upon the issues properly in the case, it has been tried upon other facts and different issues to a sufficient extent to render it impossible to sustain the verdict.

The judgment should be reversed with costs, and a new trial ordered.

GRAVES, J. It is my opinion that the declaration discloses a cause of action and that the record contains evidence tending to support it, and sufficient to warrant consideration by a jury. In regard to the ruling and proceedings relating to the objections against the conversations in Canada between Clark and McDonald and Lasier I agree with Mr. Justice Campbell, and I agree that a new trial is unavoidable.

Concerning the other topics brought under discussion I reserve my opinion.

MARSTON, C. J. concurred.

COOLEY, J. *dissenting.* The plaintiff sues in this case to recover damages for the publication by defendant of an alleged libel in the Detroit *Daily Free Press.* The plaintiff is a prominent and reputable member of the Detroit bar. The defendant publishes a reputable paper of large circulation in the State and elsewhere, and it is not claimed that the conductors are habitually negligent or reckless in its management. The question of liability is therefore confined very closely to the particular article complained of, and the facts to which it relates, and is not in any manner affected by the antecedent conduct of the writers for the paper or of its publishers. The defendant on the trial relied upon a justification of the truth of the article published, and the verdict was in its favor.

Upon the main facts in the case there is not much dispute. On the fifth day of April, 1878, Gardner K. Clark was a member of the board of trade of Detroit, and was engaged

in the purchase of grain. He had in the Mechanics' Bank at the close of banking hours standing to his credit the sum of $9867.51, and had issued his checks for $11,106.39, which according to the regular course of business would be presented for payment the next day. He also had a check given him that day by Gillett & Hall for $1014, which he had not deposited. This check, if deposited, would have left a deficiency in his bank accounts of $224.78 when the checks he had drawn should be brought in. Under these circumstances, in the evening of that day, accompanied by one McNeil, who was a member of the bar, and seems to have had a desk in the plaintiff's office, Clark applied to the plaintiff for professional advice—going to the plaintiff's residence for the purpose. In the interview plaintiff says: "Clark told me in substance that he had been delivering grain during the day, or that contracts for grain had matured, and that he had been making settlements with parties, and that he had also been receiving grain or making settlements with parties with whom he had contracts to deliver him grain, and that he had given a number of checks and had received moneys or checks from other parties with whom he had dealt during the day, and that he was fearful that his account would be garnisheed by some Chicago parties [with whom he had had previous litigation] and that his account was short of sufficient to pay the checks that were due." The shortage was stated to be about $1000, and the names of parties holding his checks were given. In the same conversation Clark spoke about owing his wife some $2500; and he asked plaintiff's advice whether there would be any criminal liability incurred by his drawing out his money from the bank. The purpose indicated in drawing it out was to enable him to effect a compromise with his creditors. "As I understood him he wanted to effect some compromise. He hadn't money enough to pay them in full, and he had either got to make a compromise or somebody got to lose his entire debt, and he was desirous of making a compromise." Plaintiff advised Clark that there would be no criminal liability in his withdrawing his money from the bank,

and he expressed his purpose to do so the following morn-
ing. It was then arranged that Clark should meet plaintiff
at plaintiff's office at a quarter to nine the following morn-
ing, for the purpose of talking over his affairs further, with
a view to their adjustment. At the meeting which took
place accordingly Clark gave plaintiff to understand that he
wished him to undertake the settlement of his affairs. "He
told me he wanted, if possible, to continue in business; and
he wanted to have his creditors seen, and to see if they
would take a certain amount in cash and give him time for
the balance, so as to leave him some capital with·which to
continue in business. The proposition he instructed me to
make was 25 per cent. in cash and the balance in three quar-
terly payments as I remember it." In this interview or in
that of the previous evening Clark told the plaintiff that he
thought of going to Canada for a few days, until his affairs
could be settled, and asked plaintiff's advice about it.
Plaintiff told him he thought it was a very serious step, and
he could not advise him to take it. Clark nevertheless
seemed to have made up his mind to go, and got $20 of
plaintiff to send to his wife, who was to meet him at the
train.

When the bank opened in the morning, Clark, accompa-
nied by the plaintiff, called, and drew out the whole sum
standing to his credit. Together they went to plaintiff's
office with the money, and while they were going up stairs
to enter the office, McNeil or some other person appeared
with the Gillett & Hall check, and handed it to Clark,
stating that the bank refused to pay it except through the
regular exchanges. Clark took the check and handed it to
plaintiff, with instructions to collect it. Other evidence
showed that McNeil had been requested by Clark to get the
money on the check, and that he had sent it by one Sheldon
to the Second National Bank, where payment was refused
as above stated. Clark was in plaintiff's office ten or fifteen
minutes after handing over the check, and then left, saying
he was going to Toronto. After he had left, plaintiff
deposited the Gillett & Hall check in the People's Savings

Bank, and took a certificate of deposit therefor, payable to his own order.

After Clark had gone, plaintiff took steps to see the creditors. He saw Mr. Alexander Lewis, one of the creditors, about ten o'clock the same morning, and arranged with him for a meeting of creditors at eleven. At that time plaintiff met the creditors, but made them no proposition. Mr. T. P. Hall, one of them, suggested that if they could get 50 cents on a dollar of their claims, "they would be well out of it," but no formal proposition to take that proportion was made. They however asked plaintiff for a proposition, and he made them none, but said he would go over to Windsor, where he supposed Clark then was, and meet the creditors again at one o'clock. Plaintiff went accordingly, but after spending some time in searching for Clark failed wholly to find him in Windsor, and returned at about two o'clock. The fact was, as afterwards appeared, that Clark had left Windsor on an eastern-bound train at twelve o'clock; a train of which plaintiff had no knowledge. Before returning, however, on the supposition that Clark must have taken an earlier train, plaintiff sent a telegram to be delivered to him at London, inquiring if he should offer 50 cents in settlement. Clark's wife in fact had taken the earlier train, and this telegram was delivered to her, and an answer returned that Clark was to take the next train. As the noon train, of which plaintiff had no knowledge, was the next train, plaintiff returned to Detroit under the impression that Clark had not yet taken the cars. He met the creditors at three o'clock or thereabouts, and there learned from some of them that they were aware of the fact that Clark left Windsor at twelve. At plaintiff's suggestion, made in expectation of receiving an answer from Clark to the telegram sent to London, the meeting with the creditors was adjourned until five o'clock.

When Clark went to Windsor in the morning McNeil appears to have followed him. He found him at Windsor at ten or soon after, and Clark informed him he had missed the first train, and made an attempt to get an engine to take

him to Hamilton, but failed.    They walked together up to
Walkerville, and Clark went back into a wood-pile, produced
the money which he had carried about his person, took a pack-
age from it and delivered the balance to McNeil, telling him
to take it to his, McNeil's, house or barn and bury it.   McNeil
says he took it as attorney for Clark's wife, by Clark's direc-
tion.    Instead of returning directly to Detroit by the regu-
lar ferry, he took a hack to Sandwich, then a sail-boat to the
American side, landing near the fort, and then went up
town, not by the street cars, but a part of the way on foot
and a part of the way by carriage.    He went directly to
plaintiff's office, and in his testimony he explains what he
did with the money as follows :  "After having it in my pos-
session I felt nervous and uneasy about it, and concluded I
would get it out of my possession; and instead of following
the instructions, I turned it over to Col. Atkinson and took
his notes payable to the order of Mrs. G. C. Clark."   These
notes he sent to Mrs. Clark at Hamilton by mail.   He says,
however, that before delivering the money to plaintiff he
took out and retained $350, and that plaintiff gave him $100
the next morning.

The amount actually handed by McNeil to plaintiff appears
to have been $8750.   Of this plaintiff deposited $7750 in
the People's Savings Bank and took certificates of deposit
therefor, payable to his own order ; the balance he put to
his own credit in his private bank account.   The Gillett &
Hall check having been refused payment when presented by
the Savings Bank, plaintiff took it up and returned to the
bank the certificate he had received for the amount when he
deposited it.

At five o'clock plaintiff again met the creditors.   He had
then no word from Clark.   He offered the creditors 25
cents in cash, and the balance in paper at three, six and nine
months, but the offer was not accepted.   Later in the day
plaintiff received a telegram from Clark telling him to offer
forty cents; and still later another telegram informing plain-
tiff that Clark would stop over in Hamilton the next day—
which was Sunday—and requesting plaintiff to disabuse the

minds of any who might think he had run away. The next morning plaintiff telegraphed Clark at Hamilton that matters were going smoothly, and he thought a settlement would be reached on Monday. Later in the day he received a telegram from Clark, which he understood to refer to McNeil, as follows: "*Personal*—Don't allow the party who came to your house with me out of your sight. Keep this from him. Letter to-night. C." On the morning of the same day an article appeared in the *Free Press*, giving some account of the affair so far as it had then become public, and commenting with severity upon the course of Clark.

No result having been reached at the five o'clock meeting of Saturday, two of the creditors, McDonald and Lasier, started for Toronto by the Grand Trunk road to find Clark. They could get no further than Hamilton, but there at the hotel Clark was found. They told him they had come to get a settlement, or to find out what he meant, because they had lost confidence in the attorney who was acting for him. Clark was surprised at seeing them and showed them plaintiff's telegram that all was working smoothly. He told them nearly all the money had been sent back to Detroit, and that he had instructed plaintiff to settle with them the best he could. He then proposed to give an order for the money and let one of them take it back to Detroit, but instead of informing them on whom he would draw, proposed to telegraph the name to Detroit. In the course of the interview they drew from him the fact that the money had been entrusted to McNeil, but not until after he had offered to telegraph and have a detective put on the track of the person who had the money. He also offered in this interview to pay fifty cents on the dollar, but all his offers were declined. At last by promising him a safe conduct, they induced him to return with them to Detroit, where they arrived on Monday morning. On arriving they went directly to McNeil's house, where Clark had a private interview with McNeil, and then they all went together to plaintiff's house. Here Clark had an interview with plaintiff, and it was arranged they should all meet at Clark's house at nine o'clock. The

negotiations at that time reached no result, and McDonald and Lasier having heard that threats were being made to prosecute Clark on criminal complaints, secured a hack to take him to Windsor, where he remained during the day. Towards night, however, he was prevailed upon to return to Detroit. The next morning, April 9th, a second article appeared in the *Free Press*, made up largely from information derived from the plaintiff, as is shown further on.

On the morning when this article appeared, Charles F. Clark of Boston, a brother of Gardner K. Clark, reached Detroit in response to a telegram from the creditors, and immediately had an interview with them which resulted in a settlement on the basis of paying seventy-five cents on the dollar and giving paper for the balance. Plaintiff delivered to the Clarks the certificates of deposit for $7750 on their undertaking to return to him his notes. He also promised to send them his bill, and any balance, should there be one, of money in his hands. The bill was subsequently sent in. Contained in it is a charge of $125 for services in previous litigation with Chicago parties, and $100, which plaintiff had paid J. L. Chipman as a retainer and for counsel as to Clark's criminal responsibility for drawing out the money as he did from the bank.

The third article in the *Free Press*, and the one on which the suit is grounded, was published April 16th. This is here given in full.*

---

*EXHIBIT I.

*An Inside View—Some Hitherto Unpublished Facts Respecting the Clark Affair—The Figure which Several Parties Cut Therein—The Movements of Clark and the Action of His Attorneys—Clark's " Misfortunes" the Biggest Kind of Grist for His Lawyer—Rather Slight Services for a Very Large Fee—$125 Gathered in for "Previous Services"—A Plain, Unvarnished Tale from which Each Reader Can Draw His Moral.*

One week ago last Saturday the commercial circles of Detroit, especially in the vicinity of the board of trade building, were startled by the discovery that Gardner K. Clark, a grain operator, was missing, together with some $9700. The fact that Clark owed certain grain merchants about $11,000, coupled with the fact that he had apparently left nothing to meet his debts with, caused his creditors to have more than usual interest in his movements. Their anxiety, the discovery that Clark, together with one John Atkinson, had visited the bank and drawn the money, an account of Atkinson's sudden and early appearance on Wood-

bridge street, where he announced himself as Clark's attorney, together with a report of several meetings between him and Clark's creditors, and of Clark's flight to and return from Hamilton and his final settlement Tuesday evening with his creditors, have all appeared in detail in the columns of the Detroit newspapers, and has likewise furnished much food for gossip and conjecture among citizens generally.

Many accepted the report contained in the newspapers as giving a full account of the disreputable affair, but others drew conclusions of a different tenor and were satisfied there was a "power behind the throne" that moved in a mysterious way. Inasmuch as the story is one in which the mercantile community especially and citizens generally are much interested, it seems necessary to relate the whole of the facts, the outlines of which have only heretofore been published. The following inside history of the case reflects no credit upon the parties of the second part, who have figured more or less prominently in the affair. It is as related by Clark and his creditors:

Friday afternoon Clark claims he was informed that certain Chicago parties were going to garnishee his (Clark's) bank account which he kept in Butler's bank. That night, or early the next morning, Clark, at the suggestion of Hal. E. McNeil, called on John Atkinson. The advice that was given to Clark by Atkinson is, of course, not positively known to any beside those two, but the subsequent visit of Clark and Atkinson on Saturday morning to the bank, and their drawing out the money, to be followed almost immediately by Clark's departure for Windsor, caused certain inferences to be drawn too obvious to require mention.

On withdrawing his money, $9,867, from the bank. Clark passed part of it to Atkinson, which, on arriving at the head of the stairs leading to Atkinson's office, was, Atkinson stated, passed back to Clark. A messenger was then, or shortly afterward, sent to the Second National Bank with a check of Gillett & Hall's for over $1000, which Clark had not deposited with his other checks Friday night. The bank refused to give the messenger the money, and he retired.

About this time holders of Clark's checks became "nervous," and the discovery that Clark had "no funds" in his bank was made. T. P. Hall, of Gillett & Hall, on this discovery, ordered the Second National to refuse payment on his check payable to Clark, if it was presented. Shortly after his departure from the bank the runner from the People's Savings Bank presented the check, which had been indorsed and deposited by John Atkinson in the People's Savings Bank, and a certificate of deposit taken therefor. On the face of this the teller wrote "payment refused" and passed it back. Clark, in the meantime, in the early forenoon, went over to Canada.

Atkinson, subsequent to his leaving, visited the board, and at a meeting of the creditors stated that he was Clark's attorney, and that Clark was in Windsor. When questioned he stated that he had no proposition to make, but would go to Windsor and see Clark and ascertain what Clark would be willing to do. The result of his interview with Clark he would make known to the creditors at 1 o'clock.

Between 12 and 1 o'clock a dispatch was received from Chief of Police Rogers, dated Chatham, stating that Clark was on the train with him bound for Toronto. This information the creditors decided to keep to themselves, as they did the discovery made by one of their number of figures in lead pencil made in a book brought by Atkinson on his first visit to the creditors, showing that some one had made a list of the creditors and figured out the sum, 25 per cent. of his indebtedness, which would be tendered in cash.

In the neighborhood of 2 o'clock Atkinson re-appeared and represented that he could not find Clark, but intimated that Clark would be willing to pay 25 per cent. in cash and the balance in notes. He informed the creditors he would go to Windsor again and see Clark, and would report

at a meeting at five that afternoon. At or near the appointed hour he again met the creditors and stated, after considerable questioning, that he had not seen Clark, but he had received a communication from him, in which he, Clark, authorized him to offer twenty-five per cent. in cash, and the remainder in notes for three, six and nine months. Prior to this, of course, the telegram from Chief Rogers had been received, and the creditors were sufficiently apprised of Clark's movements, but their knowledge, as above noted, they kept concealed from Atkinson. Being interrogated as to the check of Gillett & Hall, which had been presented at the Second National Bank a second time with his indorsement, exhibiting the check, he in substance said: "You can see what I have done. To prevent any parties from collecting this check, should they gain possession of it, I have had written across its face 'Payment refused.'"

As above related, and as Mr. Hall informed the creditors, the teller of the Second National Bank had performed that duty through Mr. Hall's. instructions, and not through Atkinson's.

At the five o'clock meeting Mr. Atkinson was very persistent in claiming that Clark did not have over $5000 to $6000 with him, and said he did not know where the remainder was unless he had spent it, or paid an overdraft. He was then informed that the "creditors" knew Clark was. en route for Toronto.

Two of Clark's creditors, Lasier and McDonald, left Saturday night in pursuit of Clark, and succeeded in finding him at Hamilton, at 11 A. M. Sunday. Clark stated that he had less than $100 with him, and that the remainder was in Detroit. When informed that no settlement had been effected, he expressed great surprise, as he, so he stated to Lasier and McDonald, had been informed, by a dispatch from Atkinson, that "everything was working smoothly." He afterwards stated to the same creditors that he had instructed Atkinson, before leaving Detroit for Windsor, to see his creditors and offer them 25 per cent. in cash, and the remainder of his indebtedness in notes. He stated further that on getting over to Windsor he became very nervous, and was soon followed by Hal. E. McNeil, whom he claims said the creditors were making a "big fuss" over his action. About eleven o'clock Saturday forenoon Clark says he gave to Hal. E. McNeil all the money he had drawn from the bank less about $100, which he reserved to pay his expenses. This was before Atkinson met the creditors in the afternoon visits. Clark instructed McNeil to give the money to Atkinson at once, as he says, to settle immediately with his creditors.

It is quite apparent that, if McNeil did as Clark says he was instructed to do by him, Atkinson had in his possession the money which, at the meeting of the creditors later in the day, he claimed Clark had taken with him, or the $5000 or $6000 mentioned, and out of which Clark had authorized Atkinson to offer the 25 per cent. in cash. As Clark left on the noon train Saturday, he must, of necessity, have given this money to McNeil before that hour.

Clark, when found by Lasier and McDonald, showed his lack of confidence in his home representatives by offering to telegraph and have a detective shadow the man who had his creditors' money until they could get back to Detroit, a question of but a few hours' time. He also offered to give an order for it, which was declined. Clark finally consented to return to Detroit and endeavor to regain possession of his, or rather, his creditors' money. Arriving at Detroit early Monday morning the party first drove in a carriage to McNeil's residence. McNeil, when aroused, and on ascertaining that Clark had returned, showed surprise. Clark and McNeil went into an adjoining room together, and shutting the door they remained closeted for five minutes or more. What occurred is not known, but on re-appearing McNeil said he would finish dressing and would accompany them to Atkinson's residence. On arriving at Atkinson's, McNeil disappeared up stairs, and some minutes elapsed before

Atkinson and McNeil made their appearance. Atkinson, on entering the room, drew Clark aside, and had a private conversation with him.

Clark stated to Lasier and McDonald that McNeil, in answer to his inquiries as to what he had done with the money he had requested him to take from Windsor to John Atkinson, said that he had given the entire amount to Atkinson. Clark also informed Lasier and McDonald that Atkinson claimed it was $500 short when he received it. Another meeting of the creditors was held that forenoon, but nothing was accomplished. Certain parties threatened to bring criminal prosecution against Clark, who was notified and stepped back to Windsor. Investigations then made showed that Atkinson had deposited, Saturday, in the Peoples Savings Bank, $7750, for which he had taken a certificate of deposit.

Tuesday morning Charles F. Clark, brother of Gardner K. Clark, who had been telegraphed for by the creditors, arrived, and in response to his request was met by T. P. Hall and afterwards joined by Alex. Lewis and John G. Erwin, who informed him that the creditors were unwilling to trust his brother's counsel, John Atkinson, and that if he could be got out from under his influence they thought a speedy settlement might be effected. Charles F. Clark saw his brother and interviewed Atkinson, the result of which was that a certificate of deposit for $7750 was turned over to Alex. Lewis to divide among the creditors, who held a meeting that evening at Clark's residence and agreed to accept that and a promise to pay the remainder. At the time of this meeting a messenger presented an envelope addressed to Gardner K. Clark from John Atkinson. It contained a bill for services: a copy of its most important items is appended:

GARDNER K. CLARK, *Dr.*          *To* ATKINSON & ATKINSON:

| | | |
|---|---:|---:|
| Bill for *previous* services.......................... | $125 | 00 |

Bills for services in this case, as follows:

| | | |
|---|---:|---:|
| Retainer and services................................... | 500 | 00 |
| Paid Cameron & Clearly, of Windsor.................. | 20 | 00 |
| Paid McNeil........................................... | 100 | 00 |
| To retain Chipman..................................... | 100 | 00 |
| Telegrams............................................. | 2 | 75 |
| Total............................................... | $847 | 75 |

Deducting the amount of his bill, he acknowledged standing to Clark's credit about $180. From joint statements of Clark and the creditors, and the bill, as submitted by Atkinson, the following showing is easily deducted:

| | | |
|---|---:|---:|
| Atkinson's bill.......................................... | $847 | 75 |
| Amount Atkinson states there is standing to Clark's credit... | 180 | 00 |
| Amount kept by Clark in Windsor about.................. | 100 | 00 |
| Amount advanced to Clark on his return from Canada...... | 500 | 00 |
| Amount found in bank.................................. | 7750 | 00 |
| Total amount accounted for......................... | $9377 | 75 |
| Amount originally drawn from Butler's Bank.............. | 9867 | 00 |
| Deficiency unaccounted for............................... | $489 | 25 |

As the affair now stands, the creditors of Clark have received 75 per cent. of their claims in cash. Atkinson has received $625 for his "services." Various parties have been paid $222.75, and some one has in the neighborhood of $500, which is, as yet, not present or accounted for.

The following day was published in the same paper a statement from Clark, and certain comments upon it, which are also here given.*

---

### *EXHIBIT II.

#### A STATEMENT FROM G. K. CLARK.

Having read the article in the *Free Press* of this morning as to my recent trouble with my creditors, I desire to make the following statement of facts, and trust that it will be the last time the public will be troubled with my private affairs.

I called upon John Atkinson at his house on Friday evening, April 5th, and told him that I was afraid my bank account would be garnisheed the next morning, and stated that if I drew my balance and closed my account that it would leave me without bank facilities, and consequently, if that step was taken, I could not take up my checks and pay cash in full. I asked him if there would be any criminal responsibility for drawing my money out so as to make a settlement with all alike. He said the money was mine, and of course I had a perfect right to withdraw it. I then told him I would withdraw it, and go away a few days to Toronto until the matter was settled. He did not advise me to go away. The next morning I met him at his office, and we went to the bank and drew the money, and at my request he carried a part to his office and then gave it back to me. I instructed him to see my creditors at once and make the proposition, which he did. Col. Atkinson said to me just before leaving: "Now, I understand that you want this matter settled;" and I answered, "That's just it."

At London I found a dispatch from him asking if he should offer fifty cents cash and the balance on time. I answered back: "Make it forty cents, or can't you make it forty cents?" or in words to that effect. On Sunday I received a dispatch from Col. Atkinson, saying that matters would probably be settled the next day all right.

When Mr. McDonald and Lasier came to me at Hamilton, I arranged with them a settlement that was satisfactory to them and they said they thought it would be satisfactory to all. I came back and first drove to McNeil's and from there to Atkinson's. The colonel told me the money was all right, and said he was glad I had made the settlement as I had, and he agreed to meet myself and a committee of my creditors at my house at 9 o'clock. He came as agreed. Mr. McDonald and Mr. Lasier came later with the refusal of my creditors to accept the terms settled upon, and they also stated that some of the creditors were going to or threatened to make me trouble. My first thought was to put myself into a position to defend myself. Col. Atkinson advised me to remain where I was, but I thought best to go to Windsor until I could prepare myself for anything they might do. I came back the same evening. Col. Atkinson accounted satisfactorily to me for what money came into his hands. I never asked any one to take less than 100 cents on the dollar for what I owe, and proposed to pay in full, dollar for dollar. It never entered my head that I was running away. I simply wanted to get away to avoid temporarily the importunity of my creditors. I telegraphed Mr. Erwin, secretary of the board of trade, that I would be in Hamilton on Sunday and Toronto Monday and be back here next week (last week.) I also telegraphed Col. Atkinson that if any one thought I was running away to disabuse their minds of such a belief. This, Super-

The first of the articles so published in the *Free Press* was written by Mr. Goodale, the city editor. He also wrote the second, except that the plaintiff, on being applied to for information, gave it in writing instead of orally, and what he wrote was printed as a part of the editorial. The third was written by Mr. McDonald, the commercial editor, and submitted to Mr. Quinby, the managing editor, who published it after first exhibiting it to the creditors. On this point Mr. Quinby's evidence is as follows : " Mr. McDonald, the commercial editor, brought it to me, I think, on Thursday forenoon. I read it, questioned him as to the facts, and subsequently published it, after having gone to the various persons who were interested in the case." " I saw John H. Wendell at his office. I read the article to him, to his partner, and several of the so-called creditors, including Mr. Newhall and two others, I think. I read the article to them paragraph by paragraph, and asked them at the close of each paragraph whether it was correct. The

---

intendent Rogers, who was on the train and with whom I chatted almost all the way to Hamilton, can verify, and also will Col. Atkinson, and, I presume, Mr. Erwin.

---

I have read the foregoing statement of Mr. Clark, and so far as it refers to matters within my knowledge, I know it to be true. I add this at Mr. Clark's request.                              JOHN ATKINSON.

---

REMARKS BY THE FREE PRESS.

The *Free Press* cheerfully gives place to the above unsigned communication, indorsed by Col. Atkinson, as it will to any communication designed to throw light on the transactions growing out of the Clark affair. There were certain features in the affair which, unexplained, appeared discreditable to certain parties, and any satisfactory explanation would be gladly hailed by the public for the refutation it would make of the suspicions which have gained ground. Such explanation is attempted above. As the reader will perceive, although unsigned, it comes from Gardner K. Clark. The *Free Press* had supposed yesterday afternoon that it would also have an explanation from John Atkinson, having received a note from him asking if it desired to publish the truth in the Clark affair. To this a verbal answer was returned that the *Free Press* had made an earnest effort to get at the facts in the case, and would publish any communication from him bearing on the point. None was received, however.

At nine o'clock in the evening the communication given above was handed in by G. K. Clark, who had not signed his name, though claiming the authorship of the statements therein contained. To make them doubly strong, he had had the weight of John Atkinson's name appended, and had drawn his document, or had it drawn up for him, on paper

article was unanimously endorsed, with the exception of the
Gillett & Hall check. They said they had no personal
knowledge of the manner in which that had been presented.
Subsequently I interviewed Mr. Hall of the firm of Gillett
& Hall, in reference to that, and then to make it entirely
certain I saw Mr. Davison, cashier of the Second National
Bank. After that Mr. Lasier came to my office and I read
it to him. He made one or two trivial corrections which I
interlined at the time, and the article was published as thus
interlined." He added that when he published the article
he believed the statements contained therein to be true, and
that he did not. call upon plaintiff for information at this
time, because his version had been previously given. The
evidence in the case does not show who wrote the headings
to the alleged libel, but Mr. Quinby testifies they were not
shown by him to the creditors.

The record contains a great number of assignments of
error, of which forty-one relate to the admission of evidence

---

bearing the water-mark of Atkinson. Although Clark, in the above pub-
lished statement, takes no direct exception to the article contained in the
*Free Press* of Tuesday, there are material disagreements between what
are set forth as facts in the article and in the statement of Clark.

It appears from Clark's statement that he consulted Atkinson for the
purpose of ascertaining if he could draw the money to his credit in bank
without incurring criminal responsibility. Satisfied on this point, he
proclaimed his intention to Atkinson of withdrawing the money—nearly
$10,000—and himself "withdrawing" for a few days. Clark says Atkin-
son did not advise him to go away. It might have occurred to some
lawyers that the going away was a confession of weakness unworthy of a
well-disposed, honest man; but Atkinson, if he suggested this, did not
press it with sufficient force upon Clark to convince the latter of its due
weight, for Saturday morning, April 5, Clark took the bull by the
horns, drew the money, with Atkinson by his side, and "skipped" the
town without, he says, being advised to do so.

Clark had nearly $10,000 in bank, and was anxious to settle with his
Detroit creditors (having drawn the money out so that the terrible Chi-
cago men could not get at it) and he instructed Atkinson "to see my
(Clark's) creditors, and make the proposition which he did." Atkinson
was at the first meeting of Clark's victims held after the discovery that
Clark had "no funds" to meet the check he had given the day pre-
vious. Clark tells us that Atkinson was instructed "to make the prop-
osition which he did." Atkinson confirms this statement. Yet at that
meeting of the board Atkinson said "he had no proposition to make,"
and left saying he would go over to Windsor to see if he could find Clark
and get a proposition from the latter. Clark's statement, indorsed by
Atkinson, does not agree with this statement of Atkinson made at the
first meeting of the creditors and victims. They can take either horn of
the dilemma.

against the objection of the plaintiff. To examine these in detail would be a needless task. In nearly every case the defendant seems to me to have been entitled to the evidence as of right, and in all others it was fairly admissible in the exercise of judicial discretion. The objections of the plaintiff were in the main directed to restricting the testimony to such facts in the history of Clark's performances as took place in the plaintiff's presence, and to such others as it could be shown he participated or concurred in. The chief reason urged in favor of the objections was, that the admission of proof of other facts would assume that a conspiracy was made out between Clark, McNeil and Atkinson to defraud the creditors of Clark; and that the judge did in fact assume the conspiracy in some of his rulings. But the record discloses no such assumption. The evidence was admitted because it was essential to let the jury know what the facts were in respect to which the defendant was charged with having libelled the plaintiff. The transaction described by the defendant was one occupying several days, in which several actors participated, and the successive events took place at different places, and sometimes all were actors and

---

When Atkinson returned from Windsor after his alleged fruitless search for Clark he suggested that Clark would settle, and intimated that twenty-five per cent. in cash and the balance in notes would be paid.

Even then he disclaimed instructions from Clark, but even at the first meeting a sharp-eyed creditor had observed a statement in a memorandum book in Atkinson's possession showing the amount which would come to each creditor on the basis of twenty-five per cent., and in the mean time the bulk of the money had, according to Clark's own statement to some of the creditors, been conveyed to Atkinson by Hal. E. McNeil. Clark absolutely declares that he instructed Atkinson to make the proposition which he did; yet even at two o'clock there was no proposition from Clark, but Atkinson stated that he had no doubt Clark would give twenty-five per cent. in cash and the balance in notes. At five o'clock Atkinson submitted a proposition to the creditors. It was the first direct proposition made by him as coming from Clark. It was one of twenty-five cents on the dollar, cash, and the remainder in notes of three, six, and nine months. Yet Atkinson had then in his possession funds which, even after paying the large retainer and "services," realized seventy-five per cent. in cash! The honest Clark, bound to do all he could by his Detroit creditors, through Atkinson, against whose advice Clark left town, offered twenty-five per cent., or one-third what was actually realized. Atkinson at this meeting stated that he had received a communication from Clark authorizing him to make a proposition. Inasmuch as the train on which Clark went away left at twelve

sometimes one or two only. No jury could form an intelligent opinion upon the charge unless the successive events constituting the transaction could be laid before them as a whole, and in consecutive order. To give detached facts here and there as the actual participation of the plaintiff might appear, would only serve to mystify and mislead; and it is entirely safe to say that a decision in accordance with the views advanced on the part of the plaintiff would render justification impossible in many cases where accounts have been published of transactions of public concern, and where nothing has been said that was either unjust or untrue. If there is any liberty of publication in such cases, the privilege of justification must be as broad as the liberty; and to require the several parts of the publication to be justified severally as the different actors brought separate suits, would be in effect to take away the privilege by rendering it delusive. The circuit judge evidently supposed the privilege was substantial and valuable, and he ruled for its preservation, not for its destruction. He also knew that rules of evidence were designed to elicit the truth; not to

---

o'clock noon, and at two o'clock Atkinson had heard nothing from Clark —as he stated to Clark's victims—the communication must have been by telegraph.

Clark says in his statement above that he telegraphed from London to Atkinson to make the proposition forty cents, Atkinson having suggested an offer of fifty cents. If Atkinson had received this communication why did he offer twenty-five cents instead of forty cents? If he had not received this communication why did he say he had received one authorizing an offer of twenty-five cents? There seems to be a discrepancy here.

Clark says Atkinson told him that the money was all right. Clark, however, has told more than one gentleman of unquestionable veracity that Atkinson told him that the money was $500 short when he received it. The statement of Clark strongly corroborates the intimation of the *Free Press*, that large pay for slight services was given in this case. From all that appears in Clark's statement, Atkinson received $500 for the "retainer," for advising Clark that he could withdraw from bank money standing to his credit, and for appearing at several meetings of creditors, at two of which Atkinson did not, according to Clark's statement. indorsed by Atkinson, carry out the instructions of his client, so far as submitting a proposition on the authority of Clark is concerned. Perhaps Clark has had $847.75 worth of experience. If Clark has said all there is to be said in his own behalf and that of Atkinson, it is difficult to see wherein the *Free Press* statement of Tuesday needs to be corrected in the interest of that truth which Atkinson wishes spread before the public.

suppress it; and he applied them intelligently to bringing out the facts which would enable the jury to judge whether defendant was in fault. Without all the facts before them they could not know whether the plaintiff had or had not been maligned; and all the facts were allowed to come in not on the ground of an established conspiracy, but because on a part only it was impossible for the jury to pass intelligently upon the charge on which they were sworn to return a true verdict.

Four assignments of error relate to the exclusion of evidence. In every case I think the evidence offered was plainly irrelevant. But it may not be improper to remark in this connection that we have recently had occasion in several cases to say that we cannot subject to nice and technical rules the decisions of the circuit judge on the admission and rejection of evidence, where it is apparent that he has endeavored to exercise a fair and reasonable discretion, and that no injustice has been done by his actions. *Somerville v. Richards* 37 Mich. 299; *McKeown v. Harvey* 40 Mich. 228; *Fraser v. Jennison* 42 Mich. 206; *Shipman v. Seymour* 40 Mich. 274. There are many cases in which the reception of evidence cannot be determined by inflexible rules, and the trial judge must be allowed some discretionary authority or it becomes practically impossible to bring a complicated case to a conclusion. The circuit judge does the best he can with it, but a single ruling in which the appellate court fails to agree sends it back for a new trial, and a second, third or fourth may follow if the party defeated at the circuit is ingenious enough to raise doubtful questions, until the value of the subject in controversy is eaten up with costs, and the party with whom the merits lie is forced to abandon his claim to save himself from bankruptcy. These are probable consequences of any over-nice criticism of the rulings at the circuit; and it is just as much the duty of the appellate court to see that no judgment shall be overturned on allegation of immaterial fault, as it is to award a new trial when the faults are substantial and injurious.

The errors mainly relied upon are found in the instructions to the jury. It is not claimed, nor can it well be, that these instructions were intentionally wanting in fairness or impartiality. They were evidently prepared with care; the tone is judicial and just; no opinion is expressed or intimated on the facts, and the judge has aimed to lay down legal propositions with caution and just deliberation, and to invite from the jury an unbiased judgment upon the merits. Manifestly if he has erred it has not been because of want of careful and patient investigation. The charge as a whole, therefore, invites no criticism, and the spirit of it is so fair and just that we may be sure that any particular sentence or expression which may have seemed adverse to the plaintiff was given no exceptional and improper force through unfriendly tone or manner of the judge when uttering it.

Many of the exceptions relate to the refusal of the judge to instruct the jury that certain passages in the *Free Press* article were libellous, even though literally true, because they suggested damaging inferences, and seemed to invite unfavorable criticism of the plaintiff's conduct. For example, the article in the paper stated, on the information of Mr. Hall, that the teller of the Second National Bank had performed the duty of writing "payment refused" across the face of the Gillett & Hall check through Mr. Hall's instructions and not through the plaintiff's. From this the inference was admissible if not natural, that the plaintiff had falsified in saying or intimating that he caused this writing to be made. But it is not pretended that Mr. Hall did not do what the article said he did, and the publication in this particular was therefore strictly accurate. The question then seems to be this: Does the liability of the truth to suggest unfavorable and damaging inferences render it libellous to publish it? In *Sullings v. Shakespeare* post, p. 408, we have ruled this point in the negative. There may be exceptions, and I think there are, but the exceptions cannot embrace any case where the matter published was proper for the information of the public, as was the case here. Nor was the plaintiff shut out from any showing that would

relieve the case from any unpleasant appearances. He was
permitted to give evidence of his subsequent acts in respect
to this check, and to show that he voluntarily returned it to
the drawers—who had a just offset to it to the full amount—
though it would have been entirely within his power to
compel its payment. The judge also directed special atten-
tion to this part of the article, and while saying to the jury
that he did not consider it libellous in itself, yet that they
had a right to consider it with the rest, and that "if it
tended to impute to the plaintiff a wilful falsehood, of
course it gives a very decided character to this paragraph
and perhaps to the whole article." It is not likely, in view
of this instruction, that the jury overlooked the evidence
put in by the plaintiff to show his own fairness in respect to
the check, or that they failed to give this particular part of
the article due attention.

It is next assigned for error that the judge erred in saying
to the jury that it did not strike him that the statement
"Atkinson has received $625 for his services" was libellous.
In order rightly to understand the instructions on this point,
it is necessary to copy somewhat from them:

"'Bill for *previous* services.' That word *previous* is
italicized. Now it is claimed that the italicizing of it means
that it is not what it purports to be; that is, previous ser-
vices; as much as to say: 'Well, they may call it previous
services, but we don't believe it; it is a part of this disrepu-
table and dishonest scheme.' That is what the plaintiff
claims. The declaration says: 'Meaning that there was
something discreditable and dishonest in said charge and
that such services had not been rendered, and that said
plaintiff had made dishonest charges.' Of course if that is
the meaning of it, and it means in connection with the rest
of the article that Atkinson rendered a fraudulent bill, in
order to cover up what had taken place, it would be libel-
lous." Nothing could be more fair than this. Immediately
following we have: "'Atkinson has received $625 for his
"services,"—intending to insinuate and assert and meaning
that the plaintiff's services were not legitimate and credit-

able.' It does not strike me that that is libellous." How could it have been libellous? The fact was as stated. Is it a legitimate deduction when a lawyer receives the sum which he charges for services that there is something dishonorable in the transaction? But it is said an insinuation is conveyed by the quotation marks to the word *services*. If the fact is so it is immaterial, for the declaration makes no such claim.

It is next complained that the judge instructed the jury that the words "Clark's misfortunes the biggest kind of a grist for his lawyer" were not libellous if the jury should find that Clark assented to the payment of such fees as the plaintiff took. The words, it is said, necessarily impute something disreputable, as did the words "Beecher business" in a libel recently considered. *Bailey v. Kalamazoo Publishing Co.* 40 Mich. 251. The imputation is found in the word "grist." It must be admitted that nothing is more common than to say that the quarrels of individuals bring grists to lawyers. The meaning is that they bring business and fees, perhaps large fees. If it were said they are a rich harvest for lawyers, or a bonanza, or the "biggest kind" of a good thing, the meaning to the common understanding would be the same. A respectable and dignified counsellor would not be likely to speak of any particular business being "the biggest kind of a grist" to him, but neither would he be likely to resent very bitterly the public communication of his good fortune in this figurative language. The word "grist" is expressive, but it implies nothing wrong in the receiver. Any imputation of wrong in this case is to Clark, not to the plaintiff.

The following instruction is also complained of: "The plaintiff cannot recover damages for the publication of the following words, a part of said article: 'Their anxiety, the discovery that Clark, together with one John Atkinson, had visited the bank and drawn the money,' if the jury shall find that the plaintiff did in fact visit the bank with Clark to draw the money." The judge added to this: "Of course you are to bear in mind every time that all these paragraphs

have a right to be considered in connection with other parts of the article. They may not be libellous in themselves, and yet they may tend to characterize and give tone to other parts." This instruction cannot possibly be erroneous unless something in the words recited from the article necessarily conveys an injurious meaning. Counsel find this in the word "one" prefixed to the plaintiff's name, which it is said is belittling, as much as to say, a person not generally known. But the jury were rightly left at liberty to judge of that.

In several other instances the judge instructed the jury that certain sentences of the article were not libellous *per se*, but were to be considered by them for their bearing upon the rest. These were cases in which the statements or expressions were not claimed to be false in fact, but only false in inference. If they were only open to unfavorable inferences, the judge disposed of them properly. *Sanderson v. Caldwell* 45 N. Y. 398. In some other cases the judge did not thus qualify his instruction. For example, he told the jury that the following words were not libellous: "On arriving at Atkinson's McNeil disappeared up stairs, and some minutes elapsed before Atkinson and McNeil made their appearance. Atkinson on entering the room drew Clark aside and had a private conversation with him." Surely the judge was right in holding that in these words nothing of a discreditable nature was imputed to the plaintiff. Standing alone the statement was as harmless as possible; if it was injurious it must have been made so by reason of other statements contained in the article. But the whole article was before the jury, and the judge took pains to instruct them that the proper deductions from the whole must be made by them.

It is further claimed that the court erred in the following charge: Reciting the passage from the declaration: " 'Clark, when found by Lasier and McDonald, showed his lack of confidence in his home representatives by offering to telegraph and have a detective shadow the man who had his creditors' money until they could get back to Detroit—a question of but a few hour's time; meaning that the plain-

tiff's client had lost confidence in him, and offered to tele-
graph to have him shadowed by a detective, and that the
plaintiff had the creditors' money.' You have heard the
comments of counsel, gentlemen, upon this particular part
of the alleged libel. I think it is stated before that Atkin-
son must have had the money; and it is for you to say
whether, taking what precedes with this particular para-
graph, it was intended to assert that Clark offered to have a
detective shadow Atkinson. If that was the meaning, it was
libellous." The complaint of this is that the judge himself
did not draw from the paragraph the inference that plain-
tiff, in the estimation of his client, was not to be trusted, and
that it was him that Clark proposed to have shadowed. If
this was a necessary deduction from the paragraph, no doubt
the court should have made it. But I am not convinced it
was a necessary deduction. The money was delivered by
Clark to McNeil, and it does not appear from the article
that Clark at the time of the interview with Lasier and
McDonald had information that it had been delivered to the
plaintiff. If he supposed McNeil was still retaining it, it
must have been McNeil he proposed to shadow. To say
plaintiff was meant, was to interpret the unexpressed idea
in Clark's mind to designate a person where he had abstained
from doing so ; to force upon defendant a meaning injurious
to the plaintiff where another was not only admissible, but
was shown by the evidence of preceding and subsequent
facts to have been the one had in mind at the interview
spoken of.

But to take up successively the several errors alleged with
a view to determine whether the judge, on the plaintiff's
theory of the case, has committed any error, is in my opinion
idle, because the theory itself is radically erroneous. The
case was tried on the part of the plaintiff, and has been pre-
sented here, as if it involved only private considerations; as
if it stood on precisely the same ground as it would have
occupied if the defendant had wantonly assailed the reputa-
tion of a citizen for private faults; or if a reckless libeller had
published a broadside to gratify his malice against a neighbor

by exposing alleged vices with which the public have no concern. The plaintiff by the course he has taken with the case practically denies that any question of privilege is involved. He seeks to hold the defendant responsible for every injurious deduction that can be legitimately drawn from the article published, and when a justification is attempted, it is insisted it shall be made out with a literalness and strictness such as is demanded in the criminal law to convict one of a felony. If the plaintiff's view of the law is correct, we must concede that a libel is made out; for it is undeniable that the publication admits of inferences unfavorable to the plaintiff, and that all its statements are not shown to be literally true. But if as I think this case is one of privilege, the discussion must necessarily take higher ground, and all considerations of mere technical accuracy become irrelevant. In such a case, as I have recently taken occasion to say, the public interest is paramount to that of individuals, and it is possible that a person whose character and actions are impugned may suffer without remedy when in fact he is free from just blame. *Foster v. Scripps* 39 Mich. 376, 383. We may deplore such a result without in the particular case being able to prevent it. Incidental injuries are inseparable from the exercise of rights. If the law should require every man to indemnify others for all injuries resulting from his doing those acts which are his lawful right, it would by this very penalty strip him of some which are most important and vital, by rendering them practically valueless. But there is no such requirement. Every man must exercise his rights with due regard to the corresponding and coincident rights of others, and he is responsible if he causes injury through malice or negligence, but not otherwise. This is as true of the right to free speech as it is of the right to the free enjoyment of one's property.

What is a case of privilege? In general terms it may be said to be a case in which the circumstances rebut the presumption of legal malice. By legal malice is meant no more than the wrongful intention which the law always presumes as accompanying a wrongful act, without any proof of malice

in fact.   *Wason v. Walter* L. R. 4 Q. B. 73, 87.   If one traduce another, whether knowing him or not; and whether intending to do him an injury or not, the law considers it as done of malice, because it is wrongful and intentional.   It equally works an injury whether injury was intended or not, and if there was no excuse for the slander, there should be an appropriate remedy.   *Bromage v. Prosser* 4 B & C. 247, 255.   But the presumption of law may be rebutted by the circumstances under which the defamatory words have been uttered or published; and whenever this is the case no right of action can arise, even though the character of the party concerned may have suffered, unless he is able to show that there was malice in fact.   *Wason v. Walter* L. R. 4 Q. B. 73, 87; *Toogood v. Spyring* 1 C. M. & R. 181; *Lewis v. Levy* El. Bl. & El. 537; *Taylor v. Hawkins* 16 Q. B. 308, 321; *Clark v. Molyneux* L. R. 3 Q. B. Div. 237. *Barrows v. Bell* 7 Gray 301; *Terry v. Fellows* 21 La. Ann. 375; *McBee v. Fulton* 47 Md. 403.

The privilege in a communication springs from the fact that there existed in the case some obligation or duty to speak or publish on the subject.   Sometimes this obligation is mandatory; the duty is either imposed by law, or the circumstances render it so far imperative that the party upon whom it rests must suffer some penalty or loss unless he recognizes and performs it.   In such cases the protection should be as conclusive as the duty is imperative. . We have an illustration in the case of a witness in court:   the law compels him to state what he knows that is relevant and competent in the controversy, and he will not be suffered to refuse if he would.   But the conflicts in testimony give abundant evidence that witnesses are frequently mistaken; and if they must testify under a responsibility to civil suits for all mistakes injurious to the reputation of other persons, we should encounter such evasions of process and such suppression of the facts as would in many cases make the truth practically unattainable.   In a civil suit against the witness, therefore, the law will not permit malice to be alleged or shown: if the witness testify falsely with evil intent, he

may be indicted and punished; but in a civil suit which brings it in question, his evidence must be conclusively presumed to have been given under the inspiration of proper motives. The same conclusive presumption will attend the filing of the necessary pleadings and other papers in a. cause, and the arguments of counsel, provided they do not wander from the case for the purposes of vituperation or harmful imputation upon character, conduct or motives. *Torrey v. Field* 10 Vt. 353; *Gilbert v. People* 1 Denio 41; *Hoar v. Wood* 3 Met. 193; *Strauss v. Meyer* 48 Ill. 386; *Johnson v. Brown* 13 W. Va. 71. But there are other cases in which the privilege is only *prima facie* and conditional; it exists so far as to rebut any legal presumption of malice, and constitutes a protection until actual malice is shown. It is therefore a privilege conditioned on the publication having been made with proper motives, but the proof of bad motives—or in other words, of malice in fact —must be made by the party who asserts it: *Spill v. Maule* L. R. 4 Ex. 232; *Shurtleff v. Stevens* 51 Vt. 501. Such a case is where a voter publicly criticises and condemns the character or conduct of a candidate for public honors: he has a right to do this, and is *prima facie* protected in his criticism; but if it is made to appear that his privilege is used as a cloak for groundless and malicious assaults the protection ceases because the reason on which it rests ceases. The privilege is the handmaid of good faith.

In the cases of qualified privilege the duty to speak or publish is not imperative in the sense that a law is violated if it is not recognized; it may be a moral or social duty of imperfect obligation. Lord Campbell, Ch. J., in *Harrison v. Bush* 5 E. & B. 344. Indeed most cases of conditional privilege are cases in which a party may speak or abstain at his option; and if he speaks, it is because others desire and have a right to receive information on some subject which specially concerns them, or because in his opinion some moral, social or political obligation demands it. The law imposes upon no citizen the duty to call the attention of the public to the mal-administration of public affairs, or to the

misconduct of public servants; but good citizenship may require him to speak, if his real motive in doing so is to bring about a reform of abuses, or to defeat the re-election or re-appointment of an incompetent officer. *Palmer v. Concord* 48 N. H. 211, 216. And nothing is plainer than that to hold him to the strict and literal truth of every statement, recital and possible inference, would be to subject the right to conditions making any attempt at public discussion practically worthless. Lord Campbell has well shown in *Harrison v. Bush* 5 El. & Bl. 344, and especially by his reference to the cases of *Rex v. Baillie* 21 State Trials 1, and *Fairman v. Ives* 5 B. & Ald. 642, that the law cherishes this right, and regards liberally its exercise for the public good, so that an honest mistake in seeking' the proper remedy through the publication will not be suffered to constitute a ground for recovery. Chief Justice Parker thus states the true rule in *State v. Burnham* 9 N. H. 34,. 41: "If the end to be attained is justifiable; as, if the object is the removal of an incompetent officer, or to prevent the election of an unsuitable person to office, or, generally, to give useful information to the community, or to those who have a right and ought to know, in order that they may act upon such information, the occasion is lawful, and the party may then justify or excuse the publication." Still more comprehensive is the language of the trial judge in *Kelly v. Sherlock* L. R. 1 Q. B. 686, 689 : "Every man has a right to discuss matters of public interest. A clergyman with his flock, an admiral with his fleet, a general with his army, and a judge with his jury—we are all of us the subjects for public discussion. So also is it matter of public interest, the dispute between the plaintiff [a clergyman] and his organist, and the way in which the church is used : they are all public matters, and may be publicly discussed. And, provided a man, whether in a newspaper or not, publishes a comment on a matter of public interest, fair in tone and temperate, although he may express opinions that you may not agree with, that is not a subject for an action for libel; because whoever fills a public position ren-

ders himself open to public discussion, and if any part of his public acts is wrong, he must accept the attack as a necessary though unpleasant circumstance attaching to his position. In this country, everything, either by speech or writing, may be discussed for the benefit of the public." This strong language is approved in *Kelly v. Tinling* L. R. 1 Q. B. 699; and in *Henwood v. Harrison* L. R. 7 C. P. 606, 622, the principle is declared to be "a universal one, that the public convenience is to be preferred to private interests, and that communications which the interests of society require to be unfettered may freely be made by persons acting honestly without actual malice, notwithstanding that they involve relevant comments condemnatory of individuals." The same principle is found in *Toogood v. Spyring* 1 C. M. & R. 181; *Whiteley v. Adams* 15 C. B. (N. S.) 417; *Gott v. Pulsifer* 122 Mass. 235; *McBee v. Fulton* 47 Md. 403; *Shurtleff v. Stevens* 51 Vt. 501.

Is the case before us within the principle? The facts, briefly recapitulated, are these: A member of the board of trade of the principal commercial city of the State, after having in the course of a day's business put in circulation a considerable number of checks, sought the plaintiff for advice whether he would be liable to a criminal prosecution if he should withdraw the money then in bank to his credit and take himself out of the country. The pretences for this were that he was in fear of garnishment by distant parties; that his deposit was not quite equal to his checks, and that he owed moneys to his wife. The transaction had a dishonest appearance, which evidently the plaintiff recognized. He would not advise his client to go away, but the latter nevertheless determined to go. They went together the next morning and drew the money before the checks, in the regular course of business, would be presented. The plaintiff was made to believe by his client that he was withdrawing his money in order to be in position to effect a fair compromise with his creditors; but the relation of confidence existing between him and his client no doubt inclined him to a more charitable view of the client's acts

and motives than could have been taken by any dispassionate observer not thus situated. To any disinterested business man the transaction would have been more than suspicious: it did not need the light of subsequent events to demonstrate an intended fraud. The client acted with the money after he had received it as if he knew he was running off with that which justly belonged to others; and when he caused notes to be made to his wife for amounts greatly beyond his pretended debt to her, the most favorable view that could be taken of his conduct would be that he made this disposition of his means in order to force upon his creditors such a compromise as he saw fit to dictate. The plaintiff would not undertake to justify such conduct. In morals a compromise thus forced upon a creditor is in the same category with any forcible deprivation of property.

There is no room for plausible suggestion that these matters were not of public concern. The Detroit board of trade is a public institution, in the sense that it challenges public confidence by giving assurances that it is composed of individuals whose business integrity is known and undoubted. The public had reason to trust and confide in Clark, because he had been accepted as a suitable and proper member of this body; and reason is found in this record for the belief that his associates trusted him because he had won their confidence, and not because of any actual responsibility. It is as important to the city of Detroit that it should have an honorable and trustworthy board of trade — a board that would reject and spurn association with one known or believed to be unreliable and dishonest,—as it is that it should have trustworthy mayor or controller, or police authorities or other public functionaries. The business prosperity of a commercial city must depend quite as largely upon the honor and integrity of its commercial classes as upon the character of its political rulers; and confidence in these must cease unless fraud, when it appears, can be publicly rebuked.

The defendant is publisher of a daily journal, established to give the facts of important current events, and to discuss, for the information and instruction of its readers, public affairs. This case affords neither occasion nor excuse for any general discussion of the liberty of the press in giving news : what was done here might have been done by any individual in a pamphlet under the same privilege that protects a newspaper. Nor has the fact that the liberty of the press is frequently and most grossly abused any relevancy in this case ; we are concerned only with the question whether the liberty of public discussion was abused in the particular case. The conductors of the defendant's paper, in the regular course of their business, had had brought to their attention the facts of a transaction which no one ventures to defend. This transaction in its direct consequences was calculated to defraud a number of persons of considerable sums of money ; in its indirect consequences it was likely to disturb the prevailing confidence in an important public institution, and to injure the business reputation of the city. They investigated the case, and laid the results before the public. No doubt they might have used more carefully-guarded language, and avoided irritating head lines ; but in a case of palpable fraud, which this seemed to be and was, something must be excused to honest indignation ; for the beneficial ends to be subserved by public discussion would in large measure be defeated if dishonesty must be handled with delicacy and fraud spoken of with such circumspection and careful and deferential choice of words as to make it appear in the discussion a matter of indifference. It is complained that the paper followed its first publications with a review of the whole case a week after it was all settled ; but this review was quite as proper as the first notice. No settlement could relieve the case of its worst aspects. If Clark had repented before he left Windsor, and had followed his money in its remarkable journey, by hack and sail-boat, on foot and in carriage, and recovered it for the use of his creditors, he ought still to have been brought to the bar of public opinion to be dealt with for his extraordinary conduct, whereby a considerable |

percentage of his assets had already been wasted. *Mott v. Dawson* 46 Iowa 533. The defendant's paper would have been unworthy of the confidence and support of commercial men if its conductors had shut their eyes to such a trans-action. If the plaintiff was not in fault, then it was his misfortune that it was impossible to deal with the case without bringing him into the discussion.

The communication in this case being privileged, and there being in its terms no manifest abuse of the privilege, it was incumbent on the plaintiff to give some evidence of malice before he was entitled to ask a verdict in his favor. *Taylor v. Hawkins* 16 Q. B. 308, 321; *Henwood v. Harrison* L. R. 7 C. B. 606. The case therefore failed to be made out. If such a discussion of a matter of public interest were *prima facie* an unlawful act, and the author were obliged to justify every statement by evidence of its literal truth, the liberty of public discussion would be unworthy of being named as a privilege of value. It would be better to restore the censorship of a despotism than to assume to give a liberty which can only be accepted under a responsibility that is always threatening and may at any time be ruinous. A caution in advance after despotic methods would be less objectionable than a caution in damages after in good faith the privilege had been exercised. No public discussion of important matters involving the conduct and motives of individuals could possibly be at the same time valuable and safe under the rules for which the plaintiff contends. It is a plausible suggestion that strict rules of responsibility are essential to the protection of reputation; but it is most deceptive, for every man of common discernment who observes what is taking place around him, and what influences control public opinion, cannot fail to know that reputation is best protected when the press is free. Impose shackles upon it and the protection fails when the need is greatest. Who would venture to expose a swindler or a blackmailer, or to give in detail the facts of a bank failure or other corporate defalcation, if every word and sentence must be uttered with judicial calmness and impartiality as between the swindler and his

victims, and every fact and every inference be justified by unquestionable legal evidence? The undoubted truth is that honesty reaps the chief advantages of free discussion; and fortunately it is honesty also that is least liable to suffer serious injury when the discussion incidentally affects it unjustly.

When it is said that malice must be shown in the case of privileged communications, the term "malice" is used in its legal, not in its popular sense. It is legal malice if one publishes as true what he knows to be false, or what by proper investigation he might have assured himself was false. The man who deals recklessly with the reputation of others is as justly charged with legal malice as the man who recklessly destroys their property; and the recklessness may be made so apparent by the violent and intemperate language of a communication as to require no further evidence. *Rearick v. Wilcox* 81 Ill. 77; *Pittock v. O'Niell* 63 Penn. St. 253. But the case must be very clear to justify the court in a conclusion of malice before the extrinsic facts are shown.

In what I say in this case I advance no new doctrines, but justify every statement of principle on approved authorities. It will be freely admitted that there are decided cases from which a different argument may be constructed, but it is affirmed that they are no longer deserving of credit if they ever were. The gradual and beneficial modification of the law of libel is shown in *Wason v. Walter* L. R. 4 Q. B. 73, and in so far as it has been modified it has been made more consistent with just reason. While it is admitted that the public press is often corrupt and often reckless in dealing with private reputations, it is at the same time affirmed that the duty of its conductors to abstain from such misconduct is no plainer than is the obligation of the authorities to refuse to impose penalties when in the exercise of a just independence they make use of their columns for the exposure of public wrong-doers to public condemnation. The law, justly interpreted, is not chargeable with the inconsistency of tempting conductors of the press with a deceptive pretence of liberty, and then punishing them in damages if they act upon the assumption that the liberty is genuine.

In what is said in this opinion no imputation upon the private or professional character of the plaintiff is made or intended. The opinion rests upon the conclusion that the defendant in making the publication which is the subject of the suit was exercising an undoubted privilege and performing a plain duty. I cannot participate in taking away the privilege, either directly by denying its existence, or indirectly by refusing to permit the facts to be shown on which its exercise is justified. Perhaps the privilege would have seemed to stand out more boldly and appeared more sacred if the provisions deliberately incorporated for its protection and perpetuation in every American constitution had been collated and given prominence, but it is enough for me to find it embodied in the good sense of the common law, where it has constituted one of the most important elements in the beneficent growth and progress of free States.

I think the judgment should be affirmed.