## C. C. COLEMAN V. F. P. MACLENNAN.

No. 15,385.    (98 Pac. 281.)

SYLLABUS BY THE COURT.

1. LIBEL—*Newspaper Comment—Official Conduct and Character —Privileged Matter.* If the publisher of a newspaper circulated throughout the state publish an article reciting facts and making comment relating to the official conduct and character of a state officer, who is a candidate for reëlection, for the sole purpose of giving to the people of the state what he honestly believes to be true information, and for the sole purpose of enabling the voters to cast their ballots more intelligently, and the whole thing is done in good faith, the publication is privileged, although the matters contained in the article may be untrue in fact and derogatory to the character of the candidate.

2. ——— *Candidate for State Office—Publication Outside the State.* Generally, publication should be no wider than the moral or social duty to publish. If it be designedly or unnecessarily or negligently excessive, privilege is lost. But if a state newspaper published primarily for a state constituency have a small circulation elsewhere, it is not deprived of its privilege in the discussion of subjects of state-wide concern because of that fact.

3. PRACTICE, SUPREME COURT—*Instruction Rendered Inconsequential by Special Findings.* If on the trial of a suit for libel the jury should find specially from the evidence that the plaintiff suffered no damages from the publication complained of, it will not be presumed that the finding was induced by instructions regarding particular questions in the case not related to that of damages; and the question whether such instructions misstate the law becomes immaterial, because they could not affect the plaintiff's substantial rights.

Error from Shawnee district court; ALSTON W. DANA, judge. Opinion filed November 7, 1908. Affirmed.

*Frank L. Williams, Charles Blood Smith,* and *John E. Hessin,* for plaintiff in error.

*W. P. Hackney, Waters & Waters,* and *B. P. Waggener,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: In August, 1904, the plaintiff held the office of attorney-general of the state, and was a candidate for reëlection at the general election which occurred in the following November. By virtue of his office he was a member of the commission charged with the management and control of the state school fund. The defendant was the owner and publisher of _The Topeka State Journal,_ a newspaper published at Topeka and circulated both within and without the state. In the issue of August 20, 1904, appeared an article purporting to state facts relating to the plaintiff's official conduct in connection with a school-fund transaction, making comment upon them and drawing inferences from them. Deeming the article to be libelous the plaintiff brought an action for damages against the defendant, alleging that the matter published concerning him was false and defamatory and that its publication was the fruit of malice. Among other defenses the defendant pleaded facts which he claimed rendered the article and its publication privileged.

At the trial instructions presenting the plaintiff's view of the law of privilege were refused, and the following instruction was given to the jury instead:

"As you have already observed from the statement of the case, defendant claims, as his first defense, that the publication is what is known in law as 'privileged.' A communication made in good faith, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, public or private, either legal, moral or social, if made to a person having a corresponding interest or duty, is privileged. And where an article is published and circulated among voters for the sole purpose of giving what the defendant believes to be truthful information concerning a candidate for public office and for the purpose of enabling such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in

such a case the burden is on the plaintiff to show actual malice in the publication of the article. If you believe then from the evidence in this case that on August 20, 1904, plaintiff was a candidate for reëlection to the office of attorney-general, and that defendant published said article for the sole purpose of giving to the voters of Kansas what he believed to be truthful information concerning the acts of the attorney-general, and only for the purpose of enabling such voters to cast their ballots more intelligently, and that the defendant made all reasonable effort to ascertain the facts before publishing the same, and that the whole thing was done in good faith and without malice toward plaintiff, and if you believe that the bulk of the circulation of the said paper was within the state of Kansas and that its circulation outside of the state of Kansas was only incidental, then I instruct you that your verdict must be for the defendant, although you may believe the principal matters contained in said article untrue in fact and derogatory to the character of the plaintiff. But on the contrary, if you should find from the evidence that said article was published with a malicious intent to wilfully wrong and injure plaintiff, then the fact that the article is a privileged one would constitute no defense to this action, and the plaintiff would be entitled to recover such damages as the evidence shows him to have sustained by reason of said publication."

In the course of the trial it became material whether the purchasable quality of county bonds offered to the school fund may be predicated upon the equalized valuation of property instead of its assessed valuation, and whether certain manipulations of the public funds in the state treasury were contrary to law. It likewise became necessary for the court to give the jury a definition of a conspiracy, and to apply the definition to the facts of the case. Instructions tendered by the plaintiff upon these subjects were refused, and exceptions were saved to those given. The following instruction asked by the plaintiff was refused and an exception noted:

"The court instructs you that even though you should believe from all the evidence in this case, if you do so believe it, that the publication of the article as alleged

in plaintiff's petition was privileged and justifiable within the limits of the state of Kansas, yet I instruct you that under the evidence and the pleadings in this case the publication of such article outside of, and beyond the limits of, the state of Kansas is neither privileged nor justifiable; and, if you believe from the evidence that publication of said article was made outside of, and beyond the limits of, the state of Kansas by the circulation of any number of copies of *The Topeka State Journal* containing said article, the plaintiff in this action is entitled to recover damages for such publication beyond the boundaries and limits of the state of Kansas."

No exception was taken to the following instruction relating to the subject of damages:

"In case you find for the plaintiff, the next question for you to determine is the amount of recovery. In this there is no mathematical rule that the court can give you as a guide. You will assess his damages in such sum as will compensate him for all damages he has sustained as a necessary and natural result of the publication of the article charged, and in arriving at this you should consider the injury, if any, to his feelings and his reputation, and the humiliation, if any, caused by such publication, and the injury, if any, to his business and profession. If you find that the article was published maliciously, as hereinbefore defined, you may then, if you see fit, assess damages, called 'punitive damages,' in addition by way of smart-money or punishment to the defendant for having published the article in question, and for the purpose of setting a wholesome example to others. I further instruct you that punitive damages may not be recovered by the plaintiff, nor allowed by you in your verdict, unless you shall first find that the plaintiff is entitled to recover actual damages in some amount."

Many special questions were submitted to the jury, among which were the following, the answers returned being appended:

"(1) Ques. Does the testimony show that the plaintiff sustained any actual damage by the publication of this article mentioned in his petition? Ans. It does not.

Coleman v. MacLennan.

"(2) Q. If you answer the foregoing question in the affirmative, then state in detail of what such actual damage consists. A. ————."

"(52) Q. On the 20th day of August, 1904, when said article complained of was published, did said defendant, or any of his employees, have any actual malice of or against the said plaintiff? A. No."

The jury found generally for the defendant. A motion for a new trial was denied, and the plaintiff prosecutes error.

The plaintiff claims that the court committed grievous error in its instructions to the jury and by refusing to instruct according to the plaintiff's requests, the instruction upon the subject of privilege being attacked with especial fervency. To this claim the defendant makes two answers: First, that the instructions given state the law, and, second, that even if error was committed in giving and refusing instructions it has become inconsequential in view of the special finding that the plaintiff suffered no damage from the publication of the article which occasioned the suit. The plaintiff replies that the finding referred to was induced by the instructions assailed, although they relate to other branches of the controversy.

Beyond their importance to the immediate parties the questions raised are of the utmost concern to all the people of the state. What are the limitations upon the right of a newspaper to discuss the official character and conduct of a public official who is a candidate for reëlection by popular vote to the office which he holds? What are the limitations upon the authority of this court to overturn a verdict and judgment and to remand a case for retrial upon a claim that an error of the district court respecting a particular feature of the litigation has tainted the whole result? The constitution contains a provision which reads as follows:

"The liberty of the press shall be inviolate; and all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of

such right; and in all civil or criminal actions for libel the truth may be given in evidence to the jury, and if it shall appear that the alleged libelous matter was published for justifiable ends, the accused party shall be acquitted." (Bill of Rights, § 11.)

The constitution supplies no definition of the term "liberty of the press." A right existing at the time the constitution was adopted is guaranteed, the nature and extent of which must be ascertained by looking elsewhere. Frequently it is said that the expression was used in the sense it bears in the common law. If so, the question arises: The common law at what stage of its development? Certainly not the common law of England as it existed when first transplanted to this country by our forefathers in the fourth year of the reign of King James I (1607). All printing was then subservient to royal proclamations and prohibitions, charters of privilege, license and monopoly, and decrees of the court of star chamber. The newspaper proper did not appear until 1622, and the beginnings of the modern law of libel find their source in the star chamber decision *De Libellis Famosus,* rendered in 1609.

Nothing like a definition could be framed from the law of England at any subsequent period. When the court of star chamber was abolished (in 1641) parliament assumed the prerogative respecting the licensing of publications which it had held, and the press did not become free from this restraint until 1694. Its liberty was then more theoretical than actual on account of the harshness of the law of libel and the manner in which that law was administered in the courts. The long struggle against the courts, culminating in the passage of the libel law in 1792, with which the names of Fox, Erskine and Camden are so honorably and brilliantly associated, is familiar history. The statutes *De Scandalis Magnatum* were not formally repealed until 1887, although prosecutions under them ceased long before. A species of censorship survives in the act of 1843 re-

quiring new plays to be submitted to the lord chamberlain for examination and approval, and the present state of the law of England on the subject of defamation is described in an essay, "The History and Theory of the Law of Defamation," in volume 3 of the Columbia Law Review, as follows:

"Unfortunately the English law of defamation is not the deliberate product of any period. It is a mass which has grown by aggregation, with very little intervention from legislation, and special and peculiar circumstances have from time to time shaped its varying course. The result is that perhaps no other branch of the law is as open to criticism for its doubts and difficulties, its meaningless and grotesque anomalies. It is, as a whole, absurd in theory, and very often mischievous in its practical operation." (Page 546.)

Little aid is supplied by a consideration of our own colonial history and the early history of our separate national existence. The colonies followed closely the practice of the mother country. Even the publication of general laws was forbidden by the magistrates, who yielded only after long and bitter struggles. Royal governors were instructed to prohibit printing, books were burned as offenders against the public welfare, and the school histories all tell about Governor Berkley's boast that free schools and printing-presses were not allowed in Virginia. The proceedings of the convention which framed the constitution of the United States were conducted in secret. The provision forbidding congress to pass any law abridging the freedom of speech or of the press came into the constitution by way of an amendment. The debates of the senate did not become open to the public until 1793, and the incident of the ill-starred sedition law in our constitutional history shows how far ideas relating to the protection of personal character and governmental institutions were then unreconciled in legal theory with freedom of thought and expression upon public questions.

At the time the constitution of this state was adopted some progress had been made and some clarification had taken place. But statutory improvement had been halting and inefficient, judicial decisions had often been narrow, illiberal and confusing, and the main principles of the law of libel remained substantially the same as they were when Blackstone wrote. The result is that "liberty of the press" is still an undefined term, and like some other familiar phrases of constitutional law must remain undefined. Certain boundaries are fairly discernible within which the liberty must be displayed, but precise rules can not be formulated in advance to govern its exercise on particular occasions. In the decision of controversies the character, the organization, the needs and the will of society at the present time must be given due consideration. The press as we know it to-day is almost as modern as the telephone and the phonograph. The functions which it performs at the present stage of our social development, if not substantially different in kind from what they have been, are magnified many fold, and the opportunities for its influence are multiplied many times. Judicial interpretation must take cognizance of these facts. As Mr. Chief Justice Cockburn said in deciding a famous libel suit:

"Whatever disadvantages attach to a system of unwritten law, and of these we are fully sensible, it has at least this advantage, that its elasticity enables those who administer it to adapt it to the varying conditions of society, and to the requirements and habits of the age in which we live, so as to avoid the inconsistencies and injustice which arise when the law is no longer in harmony with the wants and usages and interests of the generations to which it is immediately applied." (*Wason v. Walter,* L. R. 4 Q. B. [Eng. 1868] 73, 92.)

The constitutional guaranty clearly means that the press shall be free from previous government license, and the decisions are quite uniform, but not unanimous, that it shall be free from court censorship through in-

junctions against publication. Early writers on con-
stitutional law and early cases say that it means no
more, but later commentators and later decisions main-
tain that it does mean more. Thus Judge Cooley has
said:

"But while we concede that liberty of speech and of
the press does not imply complete exemption from re-
sponsibility for everything a citizen may say or pub-
lish, and complete immunity to ruin the reputation or
business of others so far as falsehood and detraction
may be able to accomplish that end, it is nevertheless
believed that the mere exemption from previous re-
straints can not be all that is secured by the constitu-
tional provisions, inasmuch as of words to be uttered
orally there can be no previous censorship, and the
liberty of the press might be rendered a mockery and
a delusion, and the phrase itself a byword, if, while
every man was at liberty to publish what he pleased,
the public authorities might nevertheless punish him
for harmless publications. . . . The evils to be
prevented were not the censorship of the press merely,
but any action of the government by means of which
it might prevent such free and general discussion of
public matters as seems absolutely essential to prepare
the people for an intelligent exercise of their rights as
citizens. The constitutional liberty of speech and of
the press, as we understand it, implies a right to freely
utter and publish whatever the citizen may please, and
to be protected against any responsibility for so doing,
except so far as such publications, from their blas-
phemy, obscenity, or scandalous character, may be a
public offense, or as by their falsehood and malice they
may injuriously affect the standing, reputation or pecu-
niary interests of individuals." (Cooley's Const. Lim.,
7th ed., 603, 604.)

This doctrine was recently authoritatively stated by
the supreme court of North Carolina, as follows:

"In its broadest sense, freedom of the press includes
not only exemption from censorship, but security
against laws enacted by the legislative department of
the government or measures resorted to by either of
the other branches for the purpose of stifling just criti-
cism or muzzling public opinion." (Cowan v. Fair-

*brother,* 118 N. C. 406, 418, 24 S. E. 212, 32 L. R. A. 829, 54 Am. St. Rep. 733.)

Such also is the opinion of the supreme court of Texas.

Whatever more than freedom from previous license the constitutional guaranty may include, it is clear that it does not grant immunity for the publication of articles which imperil the public peace by advocating the murder of governmental officers and the destruction of organized society. Constitutional government may at least protect its own life, and Johann Most was properly convicted under a statute designed to secure the public peace, because of an article appearing in his newspaper, the *Freiheit,* instigating revolution and murder, suggesting the persons to be murdered through the positions occupied and the duties performed by them, advising all persons to discharge their duty to the human race by murdering those who enforce law, denouncing those who would spare ministers of justice as guilty of a crime against humanity, and naming poison and dynamite as agencies to be employed in murder and destruction. (*People v. Most,* 171 N. Y. 423, 64 N. E. 175, 58 L. R. A. 509.)

Constitutional government may also under its police power take reasonable steps to protect the morals of the people for whom and by whom it is instituted, and to this end may suppress the circulation of newspapers which, like *The Kansas City Sunday Sun,* of infamous memory, are devoted largely to the publication of scandals, lechery, assignations, intrigues of men and women, and other immoral conduct. (*In re Banks, Petitioner,* 56 Kan. 242, 42 Pac. 693; *State v. Van Wye,* 136 Mo. 227, 37 S. W. 938, 58 Am. St. Rep. 627; *Strohm v. The People,* 160 Ill. 582, 43 N. E. 622.) Likewise newspapers may be suppressed which are made up principally of criminal news, police reports, and pictures and stories of bloodshed, lust and crime. (*State v. McKee,* 73 Conn. 18, 46 Atl. 409, 49 L. R. A. 542, 84

Coleman v. MacLennan.

Am. St. Rep. 124.)   Newspapers like those just de-
scribed display the licentiousness, and not the liberty,
of the press.   Here, as elsewhere in our political sys-
tem, just rules and regulations are not badges of op-
pression, but are the necessary conditions of true lib-
erty, and the constitutional guaranty under discussion
is not opposed to penal and remedial laws upon the sub-
ject of libel and the regulation of procedure in the con-
duct of libel cases.

Even in these days, when the amassing of wealth
absorbs so much of the energy of the race, it may still
be said that a good name is rather to be chosen than
great riches.   Among sovereign states that "decent re-
spect to the opinions of mankind" which prompted the
appeal to public opinion made in our own declaration
of independence is the chief sanction for the great body
of rules known and observed as international law.   The
terror of social reprobation and public disgrace induces
observance of the criminal law more than fear of fine
and imprisonment.   The desire to meet social standards
of virtue contributes to business integrity.   While the
approval of  conscience is a  strong  force, and  may
righteously isolate the martyr and the reformer for a
time, the love of deserved social esteem—the innate
craving for the social crown of "well done"—is a most
powerful motive to good conduct with the great mass
of mankind.   Without doubt it is responsible for a
large share of our mental, moral and material progress.
A good reputation honestly earned is not only one of
the most satisfying sources of a man's own content-
ment, but from a commercial standpoint it is one of
the most productive kinds of capital he can possess.
Therefore it ought to find guaranties of protection in
the fundamental law along with those which guard the
liberty of the press, and such is indeed the case.   The
provision of the bill of rights quoted takes for granted
a law of libel, and section 18 of that document places

46—78 kan.

injury to reputation on the same plane with injury to person and property. It reads as follows:

"All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

It is very clear that these words can not, however, be given unlimited signification and force in all cases. Where the public welfare is concerned the individual must frequently endure injury to his reputation without remedy. [In some situations an overmastering duty obliges a person to speak, although his words bring another into disrepute. Such is the case of a witness testifying to relevant facts in court. Reasons of public policy forbid that the question of malice in his mind should be investigated, and the communication he makes, although damaging in the extreme, is absolutely privileged. He may be prosecuted for perjury, but a civil action based upon his statements is not permitted.

"A man may be defamed by an unjust removal from office on unfounded charges; by injurious testimony given in courts of justice; by the unwarranted deductions of counsel in presenting his case adversely to the jury, and in many other ways where, notwithstanding, the agent in the injury was wholly free from legal fault. Thus, a great public character may, perhaps, suffer in reputation all his lifetime from an impeachment for an offense never in fact committed; yet if the impeachment was instituted in good faith, and on grounds apparently sufficient, those concerned in it only performed a public duty. We unhesitatingly recognize the fact that in many cases, however damaging it may be to individuals, there should and must be legal immunity for free speaking, and that justice and the cause of good government would suffer if it were otherwise. With duty often comes a responsibility to speak openly and act fearlessly, let the consequences be what they may; and the party upon whom the duty was imposed must be left accountable to conscience alone, or perhaps to a supervising public sentiment, but not to the courts." (Cooley, Torts, 2d ed., 246.)

In other situations there may be an obligation to speak which, although not so imperative, will under certain conditions prevent the recovery of damages by a party suffering injury from the statements made. There are social and moral duties of less perfect obligation than legal duties which may require an interested person to make a communication to another having a corresponding interest. In such a case the occasion gives rise to a privilege, qualified to this extent: any one claiming to be defamed by the communication must show actual malice or go remediless. This privilege extends to a great variety of subjects, and includes matters of public concern, public men, and candidates for office.

Under a form of government like our own there must be freedom to canvass in good faith the worth of character and qualifications of candidates for office, whether elective or appointive, and by becoming a candidate, or allowing himself to be the candidate of others, a man tenders as an issue to be tried out publicly before the people or the appointing power his honesty, integrity, and fitness for the office to be filled.

In the case of *Wason v. Walter*, L. R. 4 Q. B. (Eng.) 73, already cited, the question for decision was whether a report of a debate in parliament containing matter disparaging to the character of an individual, spoken in the course of debate, furnished ground for an action of libel by the party whose character was called in question. The court held that it was not, and in the opinion of Mr. Chief Justice Cockburn it was said:

"The other and the broader principle on which this exception to the general law of libel is founded is, that the advantage to the community from publicity being given to the proceedings of courts of justice is so great that the occasional inconvenience to individuals arising from it must yield to the general good. It is true that, with a view to distinguish the publication of proceedings in parliament from that of proceedings in courts of justice, it has been said that the immunity accorded

to the reports of the proceedings of courts of justice is grounded on the fact of the courts being open to the public, while the houses of parliament are not; as also that by the publication of the proceedings of the courts the people obtain a knowledge of the law by which their dealings and conduct are to be regulated. But in our opinion the true ground is that given by Lawrence, J., in *Rex v. Wright*, 8 T. R. 298, namely, that 'though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public more than counterbalances the inconvenience to the private persons whose conduct may be the subject of such proceedings.' In *Davidson v. Duncan*, 7 E. & B. 231 (E. C. L. vol. 90), 26 L. J. Q. B. 106, Lord Campbell says: 'A fair account of what takes place in a court of justice is privileged. The reason is that the balance of public benefit from publicity is great. It is of great consequence that the public should know what takes place in court; and the proceedings are under the control of the judges. The inconvenience, therefore, arising from the chance of injury to private character is infinitesimally small as compared to the convenience of publicity.' And Wightman, J., says: 'The only foundation for the exception is the superior benefit of the publicity of judicial proceedings which counterbalances the injury to individuals, though that at times may be great.'" (Page 87.)

Paraphrasing this language, it is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged.

Coleman v. MacLennan.

The law of libel which the constitution takes for granted gives expression to, and room for the operation of, these fundamental principles of public policy, and the bill of rights must be interpreted accordingly. Section 11 of the bill of rights sets off the inviolability of the liberty of the press from the right of all persons freely to speak, write or publish their sentiments on all subjects, and this fact has given rise to claims on the part of newspaper publishers of special privileges not enjoyed in common by all. Whether such claims are just need not be decided in order to determine the rights of the parties to this litigation. So far they have been rejected by the courts, and the present consensus of judicial opinion is that the press has the same rights as an individual, and no more. The basis of the contention for a more liberal indulgence lies in the modern conditions which govern the collection of news items, and the insistent popular expectation that newspapers will expose, and the popular demand that they shall expose, actual and suspected fraud, graft, greed, malfeasance and corruption in public affairs and questionable conduct on the part of public men and candidates for office without stint, leaving to the people themselves the final verdict as to whether charges made or opinions expressed were justified.

Nor is it necessary in this case to define the word "sentiments," used in section 11 of the bill of rights. If that word means no more than thoughts, judgments, opinions or notions, and the section does not protect freedom to make assertions of fact, still a more liberal libel law would not violate it. The constitution guarantees to the individual a minimum of liberty. Other law is not forbidden to secure a larger measure.

There is great diversity of opinion regarding the extent to which discussions of the fitness of candidates for office may go. In England and Canada the limit is fixed at criticism and comment, which, however, may be severe, if fair, and may include the inferring of

motives for conduct in fact exhibited if there be foundation for the inference. In some of our own states the rule is more liberal, while in others it is more narrow. According to the greater number of authorities the occasion giving rise to conditional privilege does not justify statements which are untrue in fact, although made in good faith, without malice and under the honest belief that they are true. A minority allows the privilege under such circumstances. The district court instructed the jury according to the latter view, and the instruction given has the sanction of previous decisions of this court.

In the case of *Kirkpatrick v. Eagle Lodge*, 26 Kan. 384, 40 Am. Rep. 316, a report was made to a grand lodge of Odd Fellows, by a special committee to which was referred a petition respecting the expulsion of a member of the order, stating that the officers of a subordinate lodge to which the petition had been presented were of the opinion that the sworn statements of the petition were infamously untrue. This report was received, adopted, published in the grand lodge journal, and distributed among the members of the order, for whom it was intended. The court held that the occasion for the publication prevented the inference of malice and afforded a qualified defense depending upon the absence of actual malice. The opinion distinguished between absolute and qualified privilege, and said:

"Under this classification, which is fully sustained by the authorities, the publication complained of is only conditionally privileged, and as the averments in the petition are that the injurious publication is false and malicious, and that the defendants, well knowing its falsity; maliciously published it for the purpose of bringing the plaintiff into public scandal, infamy and disgrace, the petition states a cause of action; but no recovery can be had thereon without proof of express malice on the part of the defendants, though the charge imputed in the publication be without foundation." (Page 391.)

In the case of *Redgate v. Roush*, 61 Kan. 480, 59 Pac.
1050, 48 L. R. A. 236, two paragraphs of the syllabus
read as follow:

"Where the officers of a· church, upon inquiry, find
that ·their pastor is unworthy and unfit for his office,
and thereupon, in the performance of what they hon-
estly believe to be their duty toward other members and
churches of the same denomination, publish, in good
faith, in .the church papers the result of their inquiry,
and there is a reasonable occasion for such publication,
it will· be deemed to be privileged, and· protected under
the law.

"In such case, and where the plaintiff seeks damage,
it devolves on him to establish actual malice, and where
his own testimony disproves malice the court is justified
in taking the case from the jury upon a demurrer to the
evidence."

In the course of the argument of the opinion it was
said:

"The publication is defamatory in character, and
naturally would largely deprive the plaintiff of the con-
fidence of the members of. his church organization
throughout the country.   If it was false in fact and
maliciously made, the plaintiff is entitled to recover to
the extent of the injury suffered, unless the relations
of the· parties and the circumstances of the case justi-
fied the publication and brought the defendants within
the privilege and protection of the law.   The defama-
tory statement was not absolutely privileged, as words
spoken or written by judges, jurors or witnesses in
the course of judicial proceedings, or as in legislative
debates, but it was at most a case of qualified privilege.
Whether it was so privileged must be determined by
the position occupied by the defendants, their relations
to the plaintiff and to other members of the same de-
nomination, and the circumstances under which the
publication was made.   If the statements were pub-
lished in good faith and in the performance of what was
honestly deemed to be an official or moral duty toward
other church members, and for the benefit and protec-
tion of the church organization at large, and there was
a reasonable occasion for the publication, it was privi-
leged and protected.   .   .   .   If the plaintiff· was un-
worthy or unfit to discharge the sacred functions of his

high calling, the defendants, interested in the welfare of the denomination throughout the land, would appear to have been justified in warning other members and congregations of that organization to whom the plaintiff might offer his services as pastor. If the publication was *prima facie* privileged, it devolved on the plaintiff to allege and prove that it was both false in fact and malicious in purpose." (Pages 482, 483.)

The moral and social duty of members of a great fraternity or of a great church organization to inform their brothers of the scandalous conduct of a fellow member or one of their leaders is no higher or stronger than that of electors to keep the public administration pure by warnings respecting the character and conduct of a candidate for office; and if false words are not actionable in one case unless published with actual malice they are privileged to the same extent in the other. Such is the clear declaration of the court in the case of *The State v. Balch*, 31 Kan. 465, 2 Pac. 609. True, that was a criminal case, but the rule of privilege is the same in both civil and criminal actions. It is the occasion which gives rise to privilege, and this is unaffected by the character of subsequent proceedings in which it may be pleaded.

In Balch's case a printed article making grave charges against the character of a candidate for county attorney was circulated among the voters of the county previous to the election. In the opinion holding the occasion to be privileged the court said:

"If the supposed libelous article was circulated only among the voters of Chase county, and only for the purpose of giving what the defendants believed to be truthful information, and only for the purpose of enabling such voters to cast their ballots more intelligently, and the whole thing was done in good faith, we think the article was privileged and the defendants should have been acquitted, although the principle matters contained in the article were untrue in fact and derogatory to the character of the prosecuting witness. . . . Generally, we think a person may in good faith publish whatever he may honestly believe to be

true, and essential to the protection of his own interests or the interests of the person or persons to whom he makes the publication, without committing any public offense, although what he publishes may in fact not be true and may be injurious to the character of others. And we further think that every voter is interested in electing to office none but persons of good moral character, and such only as are reasonably qualified to perform the duties of the office. This applies with great force to the election of county attorneys." (Page 472.)

Substantially the same doctrine is the basis of the following decisions: *Mott v. Dawson,* 46 Iowa, 533; *Bays v. Hunt,* 60 Iowa, 251, 14 N. W. 785; *Marks v. Baker,* 28 Minn. 162, 9 N. W. 678; *The State v. Burnham,* 9 N. H. 34, 31 Am. Dec. 217; *Palmer v. Concord,* 48 N. H. 211, 97 Am. Dec. 605; *Carpenter v. Bailey,* 53 N. H. 590; *Briggs v. Garrett,* 111 Pa. St. 404, 2 Atl. 513, 56 Am. Rep. 274; *Press Company v. Stewart,* 119 Pa. St. 584, 14 Atl. 51; *Jackson, Appellant, v. Pittsburgh Times,* 152 Pa. St. 406, 25 Atl. 613, 34 Am. St. Rep. 659; *Myers v. Longstaff,* 14 S. Dak. 98, 84 N. W. 233; *Express Printing Co. v. Copeland,* 64 Tex. 354; *Shurtleff v. Stevens,* 51 Vt. 501, 31 Am. Rep. 698; *Posnett v. Marble,* 62 Vt. 481, 20 Atl. 813, 11 L. R. A. 162, 22 Am. St. Rep. 126; *O'Rourke v. Publishing Co.,* 89 Me. 310, 36 Atl. 398; *Crane v. Waters* (C. C.), 10 Fed. 619.

The plaintiff asks that the decisions of this court quoted above be overruled, and that they be supplanted by one which shall express the narrow conception of the law of privilege held by the majority of the courts. Kirkpatrick's case was decided in 1881, and Balch's case in 1884. The Redgate decision is almost ten years old. A quarter of a century has elapsed since the doctrine of those cases was promulgated, and the legislature, coming directly from the people year after year, has not seen fit to make any modification of it. Surely in that length of time, and in view of the repetition of the error, if any were committed, some legislative ac-

tion would have been taken to safeguard the reputa-
tions of our citizens if they were unduly imperiled by
those decisions. The fact that so many courts of this
country, all of high character, of great learning and
ability, and all equally interested in correctly solving
the problems of free government, differ from us, makes
us pause; but a reversal of policy and the overturning
of what has been so long accepted as settled law would
be tantamount, under the circumstances, to legislation.
Such a step ought not to be urged upon the court ex-
cept for conclusive reasons. What are the reasons sup-
porting the majority rule? The decision most freely
quoted since it was rendered, in 1893, and chiefly relied
upon by the plaintiff here, is that of the United States
circuit court of appeals for the sixth circuit in the case
of *Post Publishing Company v. Hallam,* 16 U. S. App.
613, 8 C. C. A. 201, 59 Fed. 530. . Counsel in the case
had argued from the duty of newspapers to keep the
public informed concerning those who are seeking their
suffrages and confidence, and had asked if it were
possible that the privilege allowed in discussing the
character of public servants should be less than that
which protects defamatory statements made concern-
ing a private servant. The opinion states this argu-
ment, and then proceeds as follows:

"The existence and extent of privilege in communi-
cations is determined by balancing the needs and good
of society with the right of an individual to enjoy a
good reputation when he has done nothing which ought
to injure his reputation. The privilege should always
cease where the sacrifice of the individual right be-
comes so great that the public good to be derived from
it is outweighed. Where conditional privilege is ex-
tended to cover statements of disgraceful facts to a
master concerning a servant, or one applying for serv-
ice, the privilege covers a *bona fide* statement on
reasonable grounds to the master only, and the injury
done to the servant's reputation is with the master
only. This is the extent of the sacrifice which the rule
compels the servant to suffer in what was thought to
be, when the rule became law, a most important interest

Coleman v. MacLennan.

of society. But if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with one person only, or a small class of persons, but with every member of the public whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable grounds. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good.

"We are aware that public officers and candidates for public office are often corrupt when it is impossible to make legal proof thereof, and of course it would be well if the public could be informed in such a case of what lies hidden by concealment and perjury from judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their character outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact but are incapable of legal proof. The freedom of the press is not in danger from the enforcement of the rule we uphold. No one reading the newspaper of the present day can be impressed with the idea that statements of fact concerning public men and charges against them are unduly guarded or restricted, and yet the rule complained of is the law in many of the states of the Union and in England." (Page 652.)

Here the rule by which privilege is to be measured is correctly stated, as in *Wason v. Walter*, L. R. 4 Q. B. (Eng.) 73—the balance of public good against private hurt. The argument of counsel is then answered, and the statement is made that a candidate ought not suffer a loss in reputation with the whole public for the public good. That is the question to be decided, and not a reason why it should be so decided. Then the sole reason for the decision is stated—that honorable and worthy men will be driven from politics. Then the consequences of the decision are commented upon: Freedom of the press will not be endangered—an asser-

tion, as shown by the manner in which public men are handled by the press at the present time—an appeal to experience for proof.

The single reason upon which the Hallam decision is based is also in the nature of a prediction, and is not new. It was advanced in this country in 1808 by Mr. Chief Justice Parsons (*Commonwealth v. Clap*, 4 Mass. 163, 3 Am. Dec. 212), and by Chancellor Walworth in 1829, in the case of *King v. Root*, 4 Wend. [N. Y.] 114, 21 Am. Dec. 102. Speaking in opposition to the liberal doctrine the chancellor said:

"It is, however, insisted that this libel was a privileged communication. If so, the defendants were under no obligation to prove the truth of the charge; and the party libeled had no right to recover unless he established malice in fact, or showed that the editors knew the charge to be false. The effect of such a doctrine would be deplorable. Instead of protecting it would destroy the freedom of the press, if it were understood that an editor could publish what he pleased against candidates for office without being answerable for the truth of such publications. No honest man could afford to be an editor, and no man who had any character to lose would be a candidate for office, under such a construction of the law of libel. The only safe rule to adopt in such cases is to permit editors to publish what they please in relation to the character and qualifications of candidates for office, but holding them responsible for the truth of what they publish." (Page 139.)

These predictions call to mind that of Lord Thurlow, who, when protesting against the passage of the Fox libel act, said it would result in "the confusion and destruction of the law of England." (2 May's Const. Hist. of Eng. 122.) The actual results of the struggle ending in the enactment of that law are stated by the author cited as follows:

"The press was brought into closer relations with the state. Its functions were elevated, and its responsibilities increased. Statesmen now had audience of the people. They could justify their own acts to the world. The falsehoods and misrepresentations of the press

were exposed. Rulers and their critics were brought face to face, before the tribunal of public opinion. The sphere of the press was widely extended. Not writers only, but the first minds of the age—men ablest in council and debate—were daily contributing to the instruction of their countrymen. Newspapers promptly met the new requirements of their position. Several were established during this period whose high reputation and influence have survived to our own time; and by fulness and rapidity of intelligence, frequency of publication, and literary ability, proved themselves worthy of their honorable mission to instruct the people." (2 May's Const. Hist. of Eng. 123.)

In opposition to the high authority of *King v. Root* and the Hallam case may be placed Thomas M. Cooley, who must be reckoned with in the discussion of any question upon which he has deliberately expressed himself. Commenting on the foregoing quotation from *King v. Root,* he says:

"Notwithstanding the deplorable consequences here predicted from too great license to the press, it is matter of daily observation that the press, in its comments upon public events and public men, proceeds in all respect as though it were privileged; public opinion would not sanction prosecutions by candidates for office for publications amounting to technical libels, but which were nevertheless published without malice in fact; and the man who has a 'character to lose' presents himself for the suffrages of his fellow citizens in the full reliance that detraction by the public press will be corrected through the same instrumentality, and that unmerited abuse will react on the public opinion in his favor. Meantime the press is gradually becoming more just, liberal and dignified in its dealings with political opponents, and vituperation is much less common, reckless and bitter now than it was at the beginning of the century, when repression was more often resorted to as a remedy." (Cooley's Const. Lim., 7th ed., 644, note.)

This statement of the results of Judge Cooley's observation is in full accord with our own local experience. Without speaking for other states in which the liberal rule applied in Balch's case prevails, it may be

Coleman v. MacLennan.

said that here at least men of unimpeachable character from all political parties continually present themselves as candidates in sufficient numbers to fill the public offices and manage the public institutions, and the conduct of the press is as honest, clean and free from abuse as it is in states where the narrow view of privilege obtains.

The fact that the public welfare has been promoted in England by liberalizing the law of libel is freely acknowledged in *Wason v. Walker*, L. R. 4. Q. B. (Eng.) 73:

"Our view of libel has, in many respects, only gradually developed itself into anything like a satisfactory and settled form. The full liberty of public writers to comment on the conduct and motives of public men has only in very recent times been recognized. Comments on government, on ministers and officers of state, on members of both houses of parliament, on judges and other public functionaries, are now made every day, which half a century ago would have been the subject of actions or *ex officio* informations, and would have brought down fine and imprisonment on publishers and authors. Yet who can doubt that the public are gainers by the change, and that, though injustice may often be done, and though public men may often have to smart under the keen sense of wrong inflicted by hostile criticism, the nation profits by public opinion being thus freely brought to bear on the discharge of public duties?" (Page 93.)

Since the only reason given for the rejection of the liberal rule fails, it is pertinent to inquire if the consequences of the narrow rule are so innocuous as the Hallam case asserts; and in doing so it must be borne in mind that the correct rule, whatever it is, must govern in cases other than those involving candidates for office. It must apply to all officers and agents of government—municipal, state and national; to the management of all public institutions—educational, charitable and penal; to the conduct of all corporate enter-

prises affected with a public interest—transportation, banking, insurance, and to innumerable other subjects involving the public welfare. Will the liberty of the press be endangered if the discussion of such matters must be confined to statements of demonstrable truth, and to what a jury may, *ex post facto*, say is "fair" criticism and comment? Will free discussion of the subjects indicated be smothered if the newspapers, understand that they must respond in damages for deducing and stating a wrong conclusion of fact from strong circumstantial evidence indicating fraud, corruption or other conduct injurious to the public welfare?

The case of *Atkinson v. Detroit Free Press,* 46 Mich. 341, 9 N. W. 501, was decided upon a question of pleading and a question of evidence. The opinion of the court did not treat the subject of privilege. Mr. Justice Cooley, however, took occasion to express himself upon the point now under consideration as follows:

"The beneficial ends to be subserved by public discussion would in large measure be defeated if dishonesty must be handled with delicacy and fraud spoken of with such circumspection and careful and deferential choice of words as to make it appear in the discussion a matter of indifference. . . . If such a discussion of a matter of public interest were *prima facie* an unlawful act, and the author were obliged to justify every statement by evidence of its literal truth, the liberty of public discussion would be unworthy of being named as a privilege of value. It would be better to restore the censorship of a despotism than to assume to give a liberty which can only be accepted under a responsibility that is always threatening and may at any time be ruinous. A caution in advance after despotic methods would be less objectionable than a caution in damages after in good faith the privilege had been exercised. No public discussion of important matters involving the conduct and motives of individuals could possibly be at the same time valuable and safe under the rules for which the plaintiff contends. It is

a plausible suggestion that strict rules of responsibilty are essential to the protection of reputation; but it is most deceptive, for every man of common discernment who observes what is taking place around him, and what influences control public opinion, can not fail to know that reputation is best protected when the press is free. Impose shackles upon it and the protection fails when the need is greatest. Who would venture to expose a swindler or a blackmailer, or to give in detail the facts of a bank failure or other corporate defalcation, if every word and sentence must be uttered with judicial calmness and impartiality as between the swindler and his victims, and every fact and every inference be justified by unquestionable legal evidence? The undoubted truth is that honesty reaps the chief advantages of free discussion; and fortunately it is honesty also that is least liable to suffer serious injury when the discussion incidentally affects it unjustly. . . . In what I say in this case I advance no new doctrines, but justify every statement of principle on approved authorities. It will be freely admitted that there are decided cases from which a different argument may be constructed, but it is affirmed that they are no longer deserving of credit if they ever were. The gradual and beneficial modification of the law of libel is shown in *Wason v. Walker*, L. R. 4 Q. B. 73, and in so far as it has been modified it has been made more consistent with just reason. While it is admitted that the public press is often corrupt and often reckless in dealing with private reputations, it is at the same time affirmed that the duty of its conductors to abstain from such misconduct is no plainer than is the obligation of the authorities to refuse to impose penalties when in the exercise of a just independence they make use of their columns for the exposure of public wrong-doers to public condemnation. The law, justly interpreted, is not chargeable with the inconsistency of tempting conductors of the press with a deceptive pretense of liberty, and then punishing them in damages if they act upon the assumption that the liberty is genuine." (Pages 382-384.)

If it be said that this argument contains an element of prophecy, it may be replied that it will support the

liberal rule as well as the same kind of prophecy in the Hallam case supports the narrow rule. The Hallam case quotes the following discrimination of the two rules made by Lord Chancellor Herschel, in *Davis v. Shepstone*, 11 App. Cas. (Eng.) 187:

"There is no doubt that the public acts of a public man may lawfully be made the subject of fair comment or criticism, not only by the press, but by all members of the public. But the distinction can not be too clearly borne in mind between comment or criticism and allegations of fact, such as that disgraceful acts have been committed or discreditable language used. It is one thing to comment upon or criticize, even with severity, the acknowledged or approved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct." (Page 190.)

This statement is one of elucidation merely, and furnishes no reason for a choice between the rules. It may be observed, however, that the decisions in England are in great conflict upon the question whether fair comment is a branch of the law of privilege. Only last year a writer in the Law Quarterly Review (vol. 23, p. 97) called attention to this fact, and expressed the hope that the case of *Thomas v. Bradbury, Agnew & Co., Limited,* (1906) 2 K. B. 627, might be taken to the House of Lords, so that the defense of fair comment might be reviewed and placed upon some logical basis. It may be observed further that the distinction between comment and statements of fact can not always be clear to the mind. Expression of opinion and judgment frequently have all the force of statements of fact, and pass by insensible gradations into declarations of fact. In England fair comment includes the inference of motives, if there be foundation for the inference. (*Hunter v. Sharpe*, 4 Fost. & F. [Eng.] 983; *Campbell v. Spottiswoode*, 3 B. & S. [Eng.]

47—78 KAN.

769.) In the latter case Mr. Chief Justice Cockburn said:

"I think the fair position in which the law may be settled is this: that where the public conduct of a public man is open to animadversion, and the writer who is commenting upon it makes imputations on his motives which arise fairly and legitimately out of his conduct, so that a jury shall say that the criticism was not only honest, but also well founded, an action is not maintainable." (Page 775.)

This doctrine is repudiated in *Hamilton v. Eno*, 81 N. Y. 116, and *Negley v. Farrow*, 60 Md. 158, 45 Am. Rep. 715, both cited in support of the Hallam decision. What is a charge of intoxication—an inference from conduct and appearances, and therefore fair comment, or the statement of a fact? What is the difference between a charge of intoxication and the following:

"Having appearances which were certainly consistent with the belief that they had imbibed rather freely of the cup that inebriates. Their condition in the chapel also led one to such a conclusion." (*Davis v. Duncan*, L. R. 9 C. P. [Eng.] 396.)

In England this statement is fair comment. In New York, no matter how strongly appearances and conduct may justify the inference, a charge of intoxication made against a public officer must be fully proved: (*King v. Root*, 4 Wend. [N. Y.] 114, 21 Am. Dec. 102.) In keeping plain the distinction between comment and statements of fact the courts of some of the states leave the law very much in the attitude of saying to the newspaper: "You have full liberty of free discussion, provided, however, you say nothing that counts."

The Hallam case quotes the supreme court of Ohio in opposition to the liberal doctrine, as follows:

"We do not think the doctrine either sound or wholesome. In our opinion, a person who enters upon a public office, or becomes a candidate for one, no more surrenders to the public his private character than he does his private property. Remedy by due course of

Coleman v. MacLennan.

law, for injury to each, is secured by the same constitutional guaranty, and the one is no less inviolate than the other. To hold otherwise would, in our judgment, drive reputable men from public positions, and fill their places with others having no regard for their reputation, and thus defeat the object of the rule contended for and overturn the reason upon which it is sought to sustain it." (*The Post Publishing Co. v. Moloney*, 50 Ohio St. 71, 89, 33 N. E. 921.)

Manifestly a candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office, and the liberal rule requires no more. But in measuring the extent of a candidate's profert of character it should always be remembered that the people have good authority for believing that grapes do not grow on thorns nor figs on thistles. The other arguments furnished by the Ohio quotation have already been considered. The Hallam case contains nothing further worthy of note.

Another decision much approved, frequently quoted, and confidently proposed for consideration by the plaintiff here, is that in the case of *Upton v. Hume,* 24 Ore. 420, 33 Pac. 810, 21 L. R. A. 493, 41 Am. St. Rep. 863. The narrow rule is stated clearly, and authorities for it are cited. The only reasons urged against the rival rule are the old ones—sensitive and honorable men would eschew politics, yellow journalism would run riot, candidates would be exposed to the malignity of party strife—and this new one:

"The only safe evidence of a man's intentions are his acts, and if he accuses another of a crime he must conclusively be presumed to have intended to injure him." (Page 432.)

The doctrines of the common law relating to malice seem to the Delaware court, also, to be of the utmost importance in finding out what the true rule of privilege ought to be. (*Star Publishing Co. v. Donahoe* [Del. 1904], 65 L. R. A. 980.)

With all due deference to *Upton v. Hume,* the remarks quoted, read as if they had been written in the midst of the fog of fictions, inferences and presumptions which enshroud the law of libel. Facts and the truth never have been much in favor in that branch of the law. Its early use as a weapon and shield of caste and arbitrary power would have been impaired. Suppose a serious charge to be made: By a fiction it is presumed to be false. By a fiction malice is inferred from the fiction of falsity. By a fiction damages are assumed as the consequence of the fictions of malice and falsity. Publication only is not presumed, and until recent times the offer to show the truth of the charge as having some bearing upon liability was a sacrilegious insult to this beautiful and symmetrical fabric of fiction. Then a defendant was made to suffer additional smart for venturing to obtrude the truth as a defense if, although his proof were abundant, he barely failed, in the opinion of the jury, to make out a preponderance. It is, however, in the field of malice, where the rule stated in the quotation lies, that truth and fact are most superfluous. In the first place it is said that malice is the gist of the action for libel. This is pure fiction. It is not true. The plaintiff makes a complete case when he shows the publication of matter from which damage may be inferred. The actual fact may be that no malice exists or could be proved. Frequently libels are published with the best of motives, or perhaps mistakenly or inadvertently but with an utter absence of malice. The plaintiff recovers just the same. Therefore "the gist of the action" must be taken out of the case. This is done by another fiction. It is said that of course malice does not mean the one thing known to fact or experience to which the term may apply, but it is just a legal expression to denote want of legal excuse. In this state a statutory definition of libel making malice an essential ingredient as at the common law compels this court to say that the inten-

tional publication of libelous matter implies malice, whatever the motive may be. (*The State v. Clyne,* 53 Kan. 8, 35 Pac. 789.) So, a fiction was invented to meet an unnecessary fiction which became troublesome, and the courts go on gravely ascending the hill for the purpose of descending, meanwhile filling the books with scholastic disquisitions, verbal subtleties and refined distinctions about malice in law, malice in fact, express malice, implied malice, etc., etc.

Now, what is the fact? Instead of malice being the gist of the action it may come into a libel case and be of importance in two events only: to affect damages, and to overcome a defense of privilege. If the occasion be absolutely privileged, there can be no recovery. If it be conditionally privileged, the plaintiff must prove malice—actual evilmindedness—or fail. When it comes to this proof there is no presumption, absolute or otherwise, attaching to a charge of crime. The proof is made from an interpretation of the writing, its malignity or intemperance, by showing recklessness in making the charge, pernicious activity in circulating or repeating it, its falsity, the situation and relations of the parties, the facts and circumstances surrounding the publication, and by other evidence appropriate to a charge of bad motives, as in other cases.

Nothing else in *Upton v. Hume* requires comment, and no decisions more persuasive than those discussed have been cited or have fallen under the observation of the court. Speaking generally, it may be said that the narrow rule leaves no greater freedom for the discussion of matters of the gravest public concern than it does for the discussion of the character of a private individual. It is a matter of common experience that whatever the instructions to juries may be they do not, and the people do not, hold a newspaper publisher guilty and brand him a calumniator if in an effort in good faith to discharge his moral duty to the public he oversteps that rule. In a political libel suit, if a non-

political jury be secured, the newspaper usually gets a verdict if, in the language of Balch's case, "the whole thing was done in good faith." (31 Kan. 465.) Otherwise damages are assessed. Although he adhered to the narrow rule, Sir Frederick Pollock, when chief baron of the exchequer, came near stating its rival when he said:

"I think it quite right that all matters that are entirely of a public nature—conduct of ministers, conduct of judges—the proceedings of all persons who are responsible to the public at large, are deemed to be public property; and that all *bona fide* and honest remarks upon such persons, and their conduct, may be made with perfect freedom, and without being questioned too nicely for either truth or justice." (*Gathercole v. Miall*, 15 M. & W. [Eng.] 318, 331.)

The liberal rule offers no protection to the unscrupulous defamer and traducer of private character. The fulminations in many of the decisions about a Telamonian shield of privilege from beneath which scurrilous newspapers may hurl the javelins of false and malicious slander against private character with impunity are beside the question. Good faith and bad faith are as easily proved in a libel case as in other branches of the law, and it is an every-day issue in all of them. The history of all liberty—religious, political, and economic—teaches that undue restrictions merely excite and inflame, and that social progress is best facilitated, the social welfare is best preserved and social justice is best promoted in presence of the least necessary restraint.

Aside from other reasons for adhering to it, the court is of the opinion that the rule in Balch's case accords with the best practical results obtainable through the law of libel under existing conditions, that it holds the balance fair between public need and private right, and that it is well adapted to subserve all the high interests at stake—those of the individual, the press, and the public.

The plaintiff argues that the defense of privilege was destroyed by the fact that copies of the defendant's newspaper circulated in other states, complains of the instructions given upon the subject, and insists that the instruction offered by him should have been given. The instruction given was correct, and follows the rule announced by this court in *Redgate v. Roush,* 61 Kan. 480, 59 Pac. 1050, 48 L. R. A. 236. There a matter of interest to communicants of a church was published in the church papers in Indiana, Ohio, Texas, and Nebraska. It was inevitable that they should be read by people of other denominations. The syllabus reads:

"Where the publication appears to have been made in good faith and for the members of the denomination alone, the fact that it incidentally may have been brought to the attention of others than members of the church will not take away its privileged character."

This accords with the general rule stated in volume 25 of the Cyclopedia of Law and Procedure, at page 387. (See, also, *Hatch v. Lane,* 105 Mass. 394; *Mertens v. Bee Publishing Co.,* 5 Neb. [unoff.] 592, 99 N. W. 847.) In the cases of *State of Iowa v. Haskins,* 109 Iowa, 656, 80 N. W. 1063, 47 L. R. A. 223, 77 Am. St. Rep. 560, *Buckstaff v. Hicks,* 94 Wis. 34, 68 N. W. 403, 59 Am. St. Rep. 853, and *Sheftall v. Central Railway Co.,* 123 Ga. 589, 51 S. E. 646, language is used from which it might be inferred that privilege will be destroyed if the communication should reach the eyes of others than persons interested. This would be the end of privilege for all newspapers having circulation and influence. Generally, the publication must be no wider than will meet the requirements of the moral or social duty to publish. If it be designedly or unnecessarily or negligently excessive, privilege is lost. But if a state newspaper published primarily for a state constituency have a small circulation elsewhere it is not de-

prived of its privilege in the discussion of matters of state-wide concern because of that fact.

The second subject propounded for consideration at the beginning of this opinion is one of practice which goes to the efficiency of the administration of the law as a means of justice. Did the special finding of the jury that the evidence does not show that the plaintiff suffered any damage from the article in the defendant's newspaper render errors regarding instructions upon other matters immaterial? Under the constitution the appellate jurisdiction of this court is limited to the review of errors committed by the trial court from which the record comes. It can not consider cases *de novo* and decide them according to its own notions of the law and evidence. It can not take new evidence or pronounce any judgment except that the trial court did right or wrong in whole or in part. It can not direct what judgment the trial court shall enter unless the facts be found or agreed to. It does not have the constitutional power to do generally what ought to have been done by judge and jury at the trial, and so end the litigation, and the legislature can not, under the constitution, confer such power upon it. (*In re Burnette*, 73 Kan. 609, 85 Pac. 575.) However, before the territory of Kansas became a state the territorial legislature enacted the following statute:

"The court, in every stage of an action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." (Civ. Code, § 140; Laws 1859, ch. 25, § 148.)

Before the territory became a state the territorial supreme court adopted the rule that error will not be presumed, but must be affirmatively shown. (*F. H. Otis v. Ann C. Jenkins, Administratrix*, McCahon [Kan.] 87.) That statute and that rule have been in force ever since. They are still in force, and have been

Coleman v. MacLennan.

applied in multitudes of decisions. It would be too
much to say that the spirit of the statute and of the
rule has always been observed. It has been lost sight
of often enough. Sometimes technicality may have
been utilized in an effort to right palpable wrong.
Very often it is most perplexing to determine what is
substantial. But it is the constant purpose and en-
deavor of the court to obey the statute and to observe
the rule. It must do so in this case precisely the same
as if it were one small enough to have originated before
a justice of the peace.

"If it be conceded that the rules of procedure have
been violated in this case the judgment can not for that
reason alone be overturned. The legislature has en-
joined upon this court the duty of looking beyond de-
fects and errors in pleadings and proceedings to as-
certain if they did in fact affect the substantial rights
of the party complaining of them. Fixed rules are to
be observed and enforced, but not merely for the pur-
pose of vindicating them. Harm must result from a
wrong decision or it can not be reversed." (*Hopkinson
v. Conley,* 75 Kan. 65, 67, 88 Pac. 549.)

For obvious reasons the instruction relating to privi-
lege required consideration on its merits. It would be
pure speculation to say that other instructions given
which do not relate to damages led the jury to make the
special finding. The subject of damages was treated
independently of all other issues, and stood out as a
separate and distinct branch of the case; and the court
would be obliged to enter upon a "quest for error" in-
deed to be able to discover that the jury did not under-
stand the question and by their answer merely meant
to say that under the instructions the plaintiff had no
cause of action for damages. Error must be made to
appear in some affirmative way. It can not be pre-
sumed. If the plaintiff suffered no damage, manifestly
it is of no consequence whatever what valuation should
be used in the purchase of bonds for the school fund,
what treasury transactions are illegal, or what the law

of conspiracy may be. The substantial rights of the plaintiff could not be affected by erroneous statements of the law upon those questions.

The judgment of the district court is affirmed.